JAMES A. SHRIVER, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Shriver v. Commissioner
Docket No. 31104-83.
United States Tax Court
T.C. Memo 1987-627; 1987 Tax Ct. Memo LEXIS 672; 54 T.C.M. (CCH) 1422; T.C.M. (RIA) 87627; December 30, 1987. Thomas F. Topel, J. Marquis Eastwood, Kenneth L. Cutler, and Maureen H. Parkinson, for the petitioners. Randall G. Durfee and Joel A. Lopata, for the respondent. HAMBLEN
MEMORANDUM FINDINGS OF FACT AND OPINION HAMBLEN, Judge: Respondent determined deficiencies in petitioner's Federal income tax liability as follows: Year
Deficiency
1980
$ 23,549.00
1981
30,846.00
*673 The primary issues for our determination are whether petitioner's transactions with respect to certain computer equipment were transactions structured as a tax-avoidance scheme devoid of economic substance which should be disregarded for Federal income tax purposes and whether petitioner acquired the benefits or burdens of ownership. Subsidiary issues for our determination are (1) whether the ownership acquired, if any, was a future interest; (2) whether petitioner was entitled to deduct certain interest paid with respect to a nonrecourse installment note; (3) whether petitioner was at risk within the meaning of section 465 [1] with respect to a recourse promissory, a limited recourse note, and an assumption agreement; (4) whether the ownership interest acquired, if any, was acquired during 1980; (5) whether petitioner was entitled to claim depreciation pursuant to the half-year convention method of depreciation; and (6) whether petitioner is liable for an additional interest amount determined pursuant to section 6621(c). [2]
*674 FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts and attached exhibits are incorporated herein by this reference. Petitioner resided within the State of South Dakota at the time the petition herein was filed. Petitioner owns an automotive parts business. In December of 1980, in a transaction that is the subject of this action, petitioner purchased [3] from Finalco, Incorporated ("Finalco"), certain computer equipment manufactured by Burroughs Corporation ("Burroughs"). Petitioner and Finalco simultaneously entered into a Lease Agreement which provided that petitioner would lease the acquired computer equipment back to Finalco for a period of 96 months commencing December 1, 1980. *675 FINALCO
Finalco is the principal subsidiary of Finalco Group, Inc., formerly Financial Analytics Corporation, a publicly-held corporation, the stock of which is traded over-the-counter and reported in NASDAQ quotations. The principal offices of Finalco and Finalco Group, Inc., are located in McLean, Virginia. During the years in issue, Finalco was a closely-held company. During the years in issue, Finalco typically engaged in leasing transactions involving electronic data processing equipment in which Finalco negotiated and entered into a lease with an end-user, purchased the equipment, financed the purchase with a lending institution, and resold the equipment in a sale and leaseback transaction with an independent third party. The resale of the equipment provided Finalco with much of the capital necessary to generate additional lease transactions. In addition to generating transactions through its own marketing programs, Finalco also acquired equipment subject to existing end-user leases from other leasing companies. During its fiscal year ending June 30,1 979, Finalco entered into lease transactions of approximately $ 129,000,000 based on the original cost of equipment. *676 John F. Olmstead ("Olmstead") was president of Finalco at the time petitioner entered into the transaction. Lease Pro, Inc.
Lease Pro, Inc. ("Lease Pro") is a Montana corporation engaged in the purchase, sale and leasing of computer equipment. Lease Pro has served as a general partner in a partnership that leases personal property, other than computer equipment, and owns an interest in a leased building. Lease Pro was owned by J. L. Dubois ("Dubois") and Dean Schennum ("Schennum"). Dubois acted as the sales agent at Lease Pro. Schennum acted as business manager and administrator. Dubois and Schennum are also the principals in Dubois-Schennum Assoc., Ltd., a Montana corporation organized in August of 1980, and registered with the National Association of Securities Dealers ("NASD") for the purpose of acting as a broker-dealer because leveraged computer investments were clarified as a security under Montana law. Lease Pro acted as sales agent for Finalco in the pursuit to locate investors. Lease Pro received a commission in the amount of ten percent of the equity investment, including cash and any recourse note. During 1979 and 1980, Lease Pro's revenue attributable to *677 Finalco arranged computer investments approximated 90 percent of all revenue it earned. Lease Pro had no shareholders, officers, directors, or employees in common with Finalco Group, Inc., its affiliates, or subsidiaries. In 1980, Finalco changed the structure of Finalco arranged leveraged lease transactions to insert an intermediary purchaser into the chain of title between Finalco and the investor. Lease Pro acted as such an intermediary. The record indicates that the compensation earned by Lease Pro remained ten percent of the equity investment. Finalco prepared all documents and controlled the practice of dating documents. Lease Pro did not appraise computer equipment. Lease Pro relied on Finalco to structure and value all transactions. Background and the End User Lease
On October 2, 1980, Burroughs signed a Bill of Sale transferring certain computer systems to Utilities Leasing Corporation ("Utilities Leasing") for a total purchase price of $ 8,505,123. The effective date of the Bill of Sale was June 27, 1980. A portion of such equipment (the "Equipment") was sold for the gross amount of $ 462,118 less received credits and allowances of $ 167,887. The Philadelphia *678 Saving Fund Society (the "Bank") loaned Utilities Leasing $ 7,490,671.99 to purchase the equipment from Burroughs. The loan was evidenced by a Note and Security Agreement (the "Bank Note"), dated November 3, 1980, in the amount of $ 7,490,671.99, with interest at the rate of 11.75 percent per annum, issued by Utilities Leasing in favor of the Bank. Utilities Leasing granted the Bank, as provided in the Bank Note, a security interest in and lien (the "Lien") on the equipment owned by Utilities Leasing and leased to the End User. In an equipment lease agreement (the "End User Lease"), dated as of June 15, 1980, and amended November 10, 1980, Utilities Leasing agreed to lease all equipment included in the Burroughs Bill of Sale, a portion of which included the Equipment, to Pacific Telephone & Telegraph Company (the "End User"). The equipment was to be installed on the End User's premises at various geographic locations. The End User Lease was a typical commercial triple net lease which had a term of five years, commencing June 27, 1980, and terminating June 26, 1985, concerning the Equipment. The End User Lease required four annual rental payments of $ 78,518.36 commencing January 1, 1982, and *679 one payment of $ 39,259.18 due July 1, 1985 which covered the six-month period during 1985. The End User Lease contained a provision by which the End User could terminate the lease after three years. The End User had the option to renew the lease. During the first one year of the renewal period the End User was not required to pay rent; thereafter, the rent would be based on the fair market value of the equipment. The End User Lease did not have an option to purchase the equipment. Purchase by Finalco
In a Purchase Agreement dated October 27, 1980, Utilities Leasing sold all the computer equipment which was subject to the End User Lease to Finalco for a total purchase price of $ 8,681,389.21 (the "Utilities Leasing Purchase Agreement"). Finalco made a cash payment and assumed the Bank Note. Utilities Leasing warranted that the Bank Note would be fully amortized by proceeds from the End User Lease. Utilities Leasing is unrelated to Finalco and is a competing equipment leasing company that buys and sells computer equipment and arranges leases of such equipment. Finalco acquired the Equipment from Utilities Leasing on November 10, 1980, as evidenced by a Bill of Sale *680 of such date. The portion of the total purchase price allocable to the Equipment was $ 369,694.00, as set forth in the schedule attached to the Utilities Leasing Purchase Agreement. On November 10, 1980, Utilities Leasing assigned the End User Lease to Finalco. Inquiry by Petitioner
In the fall of 1980, petitioner contacted Mr. Albert Schweiss ("Schweiss"), a certified public accountant with the firm of McGladrey Hendrickson & Company ("McGladrey"), to discuss possible investments. Schweiss suggested that petitioner consider an investment involving the purchase of computer equipment. Schweiss performed an economic analysis of a typical leveraged lease computer transaction with respect to petitioner's projected tax liability in future years. Schweiss concluded that the residual value of equipment subject to a leveraged computer lease was critical to economic profit. Sometime between December 5, 1980, and December 26, 1980, Schweiss received a complete description of the Equipment that petitioner ultimately purchased. Schweiss gave Michael Miller ("Miller"), a CPA and partner at McGladrey who specialized in computers and computer systems, the Equipment description. Schweiss *681 asked Miller to evaluate the probable residual value of the Equipment. Schweiss considered residual value to include both resale value and the value of a renewed lease. According to Schweiss, Miller advised that if the Equipment was to be used for accounting functions, there was a high probability of residual value. Miller told Schweiss that if the Equipment was used for telecommunications purposes that it might be obsolete in five years because of advancing technology. Upon Miller's recommendation, Schweiss contacted the End User and spoke to its controller who assured him that the Equipment was used exclusively for accounting functions. Miller provided no estimate of residual value other than a view that residual value from renewals during the Owner Lease and sale at the conclusion of such lease would be high enough for petitioner to make a profit on the transaction. The analysis of Schweiss and Miller was based on the renewal of the Equipment by the End User and a determination that renewal rent would be approximately 70 percent of the End User rental rate. Schweiss assumed such amount to be $ 80,000 per year even though the End Use lease provided annual rent of $ 78,518.36. *682 Furthermore, the End User lease provided an option renewal of one year at no cost to the End User to commence June 26, 1985, and to terminate on June 26, 1986. Petitioner relied solely on the advice of Schweiss in the economic determination to enter the transaction. Petitioner consulted an attorney to review the investment package. Petitioner, at trial, demonstrated little understanding of the transaction. Petitioner was unsure of the role of Lease Pro and Finalco as he testified that Lease Pro was a lessee. Petitioner did not understand the amortization provisions of the Assumption Agreement or the Limited Recourse Note. Petitioner expressed a hope for a residual value and the view that entry into the transaction was not based solely on tax benefits. Agreement Among Finalco, Lease Pro and Petitioner
Petitioner executed an Agreement among petitioner, Finalco and Lease Pro on December 26, 1980 (the One Page Agreement"). The One Page Agreement indicates that Finalco did not execute the document. Lease Pro executed the document on December 26, 1980, and delivered it to Finalco. At the time petitioner entered into this transaction, Finalco and Lease Pro had adopted *683 the practice of utilizing a one page document to bind all parties when an investor agreed to purchase and lease equipment near the end of a taxable year. This procedure was adopted because Finalco did not have time to prepare all of the documents before the end of the year. The One Page Agreement contained the terms of the transaction. A complete set of documents [4] detailing the transaction was prepared by Finalco at a later date and then executed by all parties. Pursuant to the One Page Agreement, Finalco agreed to sell and Lease Pro agreed to purchase the Equipment at a purchase price of $ 460,618 payable as follows: Cash
$ 8,500  Recourse Promissory Note
65,000
Full Recourse Installment Note
387,118
TOTAL     $ 460,618
Lease Pro agreed to sell and petitioner agreed to buy the Equipment for a purchase price of $ 462,118, payable as follows: Cash
$ 10,000 Recourse Promissory Note
65,000
Limited Recourse Installment Note
387,118
TOTAL     $ 462,118
*684 Finalco agreed to lease the Equipment from petitioner for a term of 96 months at a rental of $ 6,229.50 per month. In addition, after the 72nd month, 50 percent of net rentals received by Finalco from any end user lease will be paid to petitioner. The parties agreed to execute documents referred to in the One Page Agreement. The One Page Agreement stated on its face that it was subject to a Rescission Agreement between petitioner and Lease Pro dated December 26, 1980. The Rescission Agreement was signed by petitioner and DuBois in his capacity as president of Lease Pro. It provided that the One Page Agreement could be rescinded by petitioner if and only if the final completed documents were not the same as those reviewed by Schweiss or if the Equipment conveyed by the final documents was not the Equipment petitioner had contracted to buy. On December 26, 1980, petitioner executed a full recourse Promissory Note and Security Agreement (the "Recourse Note") in the amount of $ 65,000 in favor of Lease Pro. The parties also agreed that the recourse amount of the Limited Recourse Note that petitioner agreed to execute would be $ 194,200. On December 26, 1980, petitioner *685 executed an Agreement of Assumption, in which petitioner assumed $ 194,200 of the Bank Note purportedly, as additional security to the Bank and to Finalco. The Assumption Agreement was one of the documents that Lease Pro provided petitioner for execution. DuBois explained to Schweiss and petitioner that any payments petitioner made on the Assumption Agreement would reduce the amount petitioner owed Lease Pro under the Limited Recourse Note. The amount assumed was never intended to be in addition to the purchase price. The One Page Agreement, the Rescission Agreement, the Recourse Note and the Agreement of Assumption were reviewed by Schweiss and Green before being executed by petitioner. Sale to Lease Pro
After Finalco prepared the documents required by the One Page Agreement, Finalco and Lease Pro executed a Purchase Agreement (the "Finalco Purchase Agreement"), on December 1, 1980, whereby Finalco transferred the Equipment to Lease Pro, subject only to certain liens and leases. The total purchase price of $ 460,618 was payable as represented in the One Page Agreement as follows: Cash
$ 73,500 Full Recourse Promissory Note
387,118
TOTAL     $ 460,618
*686 Lease Pro paid Finalco $ 67,000 in cash, which was the $ 73,500 cash payment required by the One Page Agreement and Finalco's Purchase Agreement less a $ 6,000 commission to DuBois-Schennum, on April 7, 1981. Lease Pro executed a Full Recourse Installment Promissory Note in favor of Finalco for $ 387,118, dated December 1, 1980, (the "Lease Pro Recourse Note"). The Lease Pro Recourse Note included a provision which provided that, if petitioner did not pay Lease Pro the amounts due to Lease Pro under a recourse note to be executed by petitioner in favor of Lease Pro, Lease Pro could defer payment (without accruing interest on the deferred note), of an amount equal to petitioner's recourse indebtedness until the earlier of either payment by petitioner or December 1, 1980. Finalco transferred the Equipment to Lease Pro, subject to the Lien, the End User Lease and rights of Utilities Leasing by a Bill of Sale dated December 1, 1980. Sale to Petitioner
On February 24, 1981, petitioner executed all documents required by the One Page Agreement. The Purchase Agreement ("the Purchase Agreement") provided that petitioner purchase the Equipment from Lease Pro for the Amount of *687 $ 462,118 as provided in the One Page Agreement. Petitioner paid Lease Pro the amount of $ 75,000 by check dated February 24, 1981, instead of the Recourse Note in the amount of $ 65,000 as required by the One Page Agreement. [5]
Petitioner executed a Limited Recourse Promissory Note Security Agreement (the "Limited Recourse Note"), dated December 1, 1980, in favor of Lease Pro in the amount of $ 387,118 plus interest at the rate of 12 percent per year. A second Agreement of Assumption (the "Assumption"), dated November 4, 1980, in which petitioner assumed on a recourse *688 basis $ 194,200 of the Bank Note was also executed on February 24, 1981, by petitioner. The Limited Recourse Note was to be paid by 96 equal monthly payments of $ 6,229.47 each. According to its terms, petitioner was personally liable for $ 194,200 (the "Recourse Amount") of principal plus accrued interest. Petitioner's obligations under the Limited Recourse Note in excess of the Recourse Amount could be satisfied only out of the rent and other proceeds of the Equipment. The Limited Recourse Note contained a deferral of payment provision providing that in the event rent is not paid to petitioner by Finalco, petitioner may defer payment of principal and interest due, to the extent of the unpaid rent. The right to defer payments terminates on the earlier of the receipt of the delinquent rental payments or December 1, 1990. To secure the obligation represented by the Limited Recourse Note, the Limited Recourse Note granted Lease Pro a purchase money security interest in the Equipment, any lease of the Equipment, and the proceeds from the transfer or lease of the Equipment. The Assumption was intended to replace the earlier Agreement of Assumption signed by petitioner on December 26, 1980, and *689 was not intended to alter or enlarge petitioner's liability or indebtedness assumed. The Assumption dated November 4, 1980, assumed a portion of debt dated November 3, 1980. The Assumption was on a full recourse basis. Finalco sent the executed Assumption to the Bank. In the event petitioner is required, pursuant to the Assumption, to pay amounts due on the Bank Note, all amounts paid shall be deemed prepayments of the Recourse Amount under the Limited Recourse Note. Owner Lease to Finalco
On February 24, 1981, petitioner executed a Lease Agreement with Finalco effective December 1, 1980 ("Owner Lease"), providing that Finalco would lease the Equipment from petitioner. The term of the Owner Lease was from December 1, 1980, to December 31, 1988 (the "Original Term"), at a monthly rental of $ 6,229.47. Pursuant to an Assignment dated December 1, 1980, petitioner assigned the Owner Lease to Lease Pro as additional security for payment of the balance due under the Limited Recourse Note. By letter dated December 1, 1980, petitioner directed Finalco to pay the fixed monthly rent due petitioner under the Owner Lease to Lease Pro. The rental income from the Owner Lease was *690 sufficient to allow petitioner to amortize the Limited Recourse Note owing by petitioner to Lease Pro. Remarketing and Residual Sharing Agreements
On February 24, 1981, petitioner signed a Remarketing Agreement ("Remarketing Agreement") and Residual Sharing Agreement (the "Residual Sharing Agreement"). Pursuant to the Remarketing Agreement petitioner agreed to pay Finalco, for remarketing services performed by Finalco, ten percent of the proceeds received by petitioner from the sale or re-leasing of the Equipment at the end of the Owner Lease. The Residual Sharing Agreement provided that after the 72nd month of the Owner Lease and continuing until the end of the Owner Lease, all proceeds from leasing the Equipment will be distributed to petitioner until petitioner has received 120 percent of his original equity in the Equipment. Petitioner's original equity in the Equipment was specified in the Agreement as being $ 462,118, such that petitioner was entitled to receive the amount of $ 554,542 initially. Thereafter, until the expiration of the Owner Lease, petitioner is entitled to 50 percent of the proceeds received by Finalco from leasing the equipment. [6] At the end of *691 the Owner Lease all proceeds from the sale or re-lease of the Equipment will be distributed to petitioner until he has received $ 554,542 which is 120 percent of the Net Equity in the Equipment as defined in the Agreement. Thereafter, Finalco retained a 20 percent interest in Residual Revenue generated from the sale or re-lease of the Equipment. Even though Finalco is entitled to receive payment pursuant to the Remarketing Agreement only if Finalco is responsible for the sale or renewal of the Equipment, the reality of the transaction is such that petitioner must rely on Finalco for remarketing efforts. According to Olmstead, Finalco was not entitled to Residual Revenue following the Original Term of the Owner Lease or upon sale of the Equipment unless Finalco provided the remarketing services. Notwithstanding the testimony of Olmstead, the Residual Sharing Agreement specifically provides that Residual Revenue includes "All Residual Revenue received by Owner from the leasing or other use of the Equipment following the Original Term of the Owner Lease or upon sale of the Equipment" without further limitation with reference to remarketing services performed by Finalco. Net Equity *692 was defined as $ 462,118 less any investment tax credit claimed by the Owner. Petitioner claimed no investment tax credit. Consequently, petitioner was entitled to receive the initial amount of $ 554,542 of any Residual Revenue. *693 The Equipment and The Industry
The Equipment are peripheral components to the Burroughs B7800 System as follows: Quantity
Model
Description
1
B7882 IOP
Input/Output Processor
3
B7800 PCC
Peripheral Control Cabinet
1
B7800 AC
Power Control Cabinet
The B7800 System was the largest computer system manufactured by Burroughs at the time of its initial release in July of 1979 and was the Burroughs top of the line product when released to the market at that time. The first product within the B7800 System was the B7807. The B7807 was object code compatible with its predecessor the B7700 which was first released to the market in May of 1973 and subsequently upgraded by new B7700 enhancements. The B7800 System was released to the market in installments over 24 months commencing in July of 1979. The End User installed the B7821 in June of 1980. Later models, the B7830 and the B7850 were released as expected in 1981 with newly designed central processors. The B7800 did not represent a new generation of Burroughs technology. The B7800 enhanced the B7700 in an evolutionary manner. The primary feature of the B7800 was the B7882 IOP Input/Output Module. *694 The B7882 IOP Input/Output Module (sometimes hereinafter referred to as "the B7882") was the initial product of the B7800 System. The B7882 was a newly designed peripheral unit the basic function of which is to manage any input or output of data flow to or from the central processor. The B7800 typically operates with two central processors and two B7800 Input/Output processors which function independently of the central processors. The Equipment does not include a central processor. Expert Testimony of Value
Terry W. Cornwell ("Cornwell") is a Vice President of MACRO Computer Products, Inc. ("MACRO"). Cornwell has prior relevant experience of nine years employment with Burroughs where he held various marketing positions including Manager of Sales Training and Marketing Development for the United States. Cornwell joined MACRO in March of 1984. MACRO's primary business activity includes the sale and leasing of new and used Burroughs equipment. MACRO has arranged tax leveraged lease financing, somewhat similar to those arranged by Finalco, generally with a value in excess of $ 100,000. MACRO publishes the industry publication known as B-Watch which reports Burroughs product *695 releases and developments including residual value forecasts. Cornwell was qualified to testify as an expert on behalf of petitioner. Dee Morgan ("Morgan") has worked for IBM as a systems service representative. Morgan also has worked for Burroughs as a technical service representative from 1956 to 1958. From 1965 through 1983, Morgan was employed by the General Service Administration ("GSA") as a computer equipment analyst and data processing systems coordinator. While employed with GSA, Morgan provided estimates of the residual value and the economic life of computer systems to the Defense Contract Audit Agency. Cornwell concluded that petitioner's purchase of the Equipment for the amount of $ 462,118 in December of 1980 was at or below fair market value. According to Cornwell, the Burroughs list price for the Equipment at such time was $ 566,712. [7] Cornwell estimated that as of December of 1980 it was reasonable to predict residual value exceeding 20 percent of original cost in seven or eight years and a product life of nine to ten years. Cornwell provided no contingent rent opinion evidence concerning the amount of rent petitioner may receive during the last 24 months *696 of the Owner Lease. Morgan concluded that the fair market value of the Equipment in December of 1980 was $ 346,589, or 75 percent of the B7882 Burroughs list price of $ 462,118. Morgan reduced the Burroughs list price of the B7882 because the Equipment was used at the time of purchase and was not eligible property for the investment tax credit. Morgan did not value the three B7800 PCC Peripheral Control Cabinets or the B7800 AC Power Control Cabinet because such units are sold in configuration with the B7882 Input/Output processor for the list price of $ 462,118. As of December of 1980, Morgan concluded that the expected residual value of the Equipment would be zero as of December of 1986, the effective date of the Residual Sharing Agreement provisions concerning any Interim Revenue. Morgan also concluded that such residual value as of December 31, 1988, would *697 be zero. Tax Reporting
Petitioner is a cash basis taxpayer reporting on a calendar year basis. After the close of the taxable year 1980, petitioner received a document entitled Tax Summary and a completed Class Life Asset Depreciation Range System Form 4832 for the year 1980. Petitioner did not use the depreciation information or attach Form 4832 as supplied by Finalco. Petitioner reported a net loss for the taxable 1980 and attached a completed Form 4832 electing the half year convention straight-line method of depreciation utilizing a five-year useful life. [8]
Lease Income
$ 6,229 Depreciation
46,212 Taxable Income
($ 39,983)
For each of calendar years 1980 through 1984, inclusive, petitioner reported on his Federal income tax return a net loss from the equipment purchase and lease back transaction with respect to the Equipment as follows: Tax Year
Net Loss
1981
$ 54,698
1982
56,842
1983
62,078
1984
57,013
For the tax *698 year 1985, it was projected by Finalco that petitioner would recognize taxable income from his equipment purchase and leaseback transaction in the amount of $ 10,999. OPINION The present case is a companion case selected as a representative test case for a large number of dockets involving the investment in Finalco arranged sale and leaseback transactions of leveraged computer equipment. The instant case was selected to bind those cases within any of the other four categories of representative cases in which factual issues are substantially identical. [9]
At the outset, we address respondent's primary assertion that petitioner's investment with respect to the Equipment was a tax-avoidance scheme devoid of economic substance which is to be disregarded for Federal income tax purposes. Petitioner asserts that ownership of the Equipment for Federal income tax purpose has been established where petitioner entered *699 the transaction with the requisite business purpose and the transaction was supported by economic substance. Taxpayers are generally free to structure their business transactions as they please, though motivated by a tax reduction considerations. Gregory v. Helvering,293 U.S. 465 (1935); Rice's Toyota World, Inc. v. Commissioner,81 T.C. 184, 196 (1983), affd. on this issue 752 F.2d 89 (4th Cir. 1985). However, it is well settled that a transaction entered into solely for the purpose of tax reduction and which is without economic, commercial or legal purpose other than the expected tax benefits is a sham without effect for Federal income tax purpose. Frank Lyon Co. v. United States,435 U.S. 561 (1978); Rice's Toyota World, Inc. v. Commissioner,81 T.C. at 196; Grodt & McKay Realty, Inc. v. Commissioner,77 T.C. 1221, 1243 (1981). Nevertheless, the existence of tax benefits accruing to an investor does not necessarily deprive a transaction of economic substance. Frank Lyon Co. v. United States, supra; *700 Estate of Thomas v. Commissioner,84 T.C. 412, 432 (1985). In the sale and leaseback context, we set forth a standard that the nonuser-owner recipient of tax benefits must specifically establish that entry into the transaction was motivated by business purpose to justify the form of the transaction and that the transaction was supported by economic substance. Rice's Toyota World, Inc. v. Commissioner,81 T.C. at 201-203. [10] In Rice's Toyota World, Inc., we stated that the tests developed under the sham transaction doctrine are applied to determine whether a threshold level of business purpose or economic substance is present. Rice's Toyota World, Inc. v. Commissioner,81 T.C. at 196. [11]
*701 Our inquiry of business purpose and economic substance is inherently factual as indicated in several recent cases concerning sale and leaseback transactions of computer equipment. Torres v. Commissioner,88 T.C. 702 (1987); Bussing v. Commissioner,88 T.C. 449 (1987), supplemental opinion 89 T.C.    (Nov. 24, 1987); Gefen v. Commissioner,87 T.C. 1471 (1986); Mukerji v. Commissioner,87 T.C. 926, 968 (1986); James v. Commissioner,87 T.C. 905 (1986); Coleman v. Commissioner,87 T.C. 178 (1986), affd. per curiam 833 F.2d 303 (3d Cir. 1987); Estate of Thomas v. Commissioner, supra;Rice's Toyota World, Inc. v. Commissioner, supra.[12]
We noted in Rice's Toyota World, Inc. that the drawing of a precise line of demarcation between valid and invalid transactions is invariably difficult. Rice's Toyota World Inc. v. Commissioner,81 T.C. at 197. In this context, petitioner bears *702 the burden of proof as respondent's determination that the transaction was a tax-avoidance scheme devoid of economic substance is presumptively correct. Welch v. Helvering,290 U.S. 111 (1933); Rule 142(a). Based on our review of the record herein, we conclude that the transaction was not motivated by a business purpose and was devoid of economic substance so as to be disregarded for Federal income tax purpose. Based on our review of the record, we find that petitioner did not manifest a subjective business purpose with respect to the investment. Petitioner relied solely on Schweiss to determine the economic attractiveness of the transaction. Schweiss contacted the End User to ascertain whether the Equipment was used to perform an accounting function. Schweiss did not facto the End User option to renew at no cost in his Interim Revenue analysis concerning renewals to determine reasonable renewal rentals. Furthermore, the analysis assumed a renewal rent in excess of that the End User paid to Finalco pursuant to the End User Lease. The investigation of Schweiss failed to demonstrate why the End User would be compelled to extend the lease solely because an accounting *703 function was performed. Neither Miller or Schweiss provided an estimate of residual value other than the expectation that such value would be sufficient to earn an economic profit. We are not persuaded that the mere act of contacting the End User to determine the function of the Equipment use is sufficient to attribute business purpose in a tax advantaged investment where fundamental aspects of the underlying End User Lease commitment are not questioned. We found much of the testimony of Schweiss and petitioner to be self-serving testimony contrary to the clear indication of the record with particular reference to petitioner's failure to understand basic aspects of the investment.
The focus of our inquiry is to perform an objective analysis of the investment to determine whether any realistic opportunity for economic profit existed exclusive of the propitious tax benefits. We analyze the transaction as a prudent investor, Rice's Toyota World, Inc. v. Commissioner,81 T.C. at 209, and we recognize that our determination cannot depend on unrealistic demands for certainty. *704 Gefen v. Commissioner,87 T.C. at 1492. The parties rely on expert testimony to establish the fair market value and the residual value of the Equipment on December 30, 1979. We are not bound by the opinion of any expert witness when that opinion is contrary to our own judgment. Chiu v. Commissioner,84 T.C. 722, 734 (1985). We may embrace or reject expert testimony, whichever, in our best judgment, is appropriate. Helvering v. National Grocery Co.,304 U.S. 282 (1938); Silverman v. Commissioner,538 F.2d 927, 933 (2d Cir. 1976), affg. a Memorandum Opinion of this Court. Based on our analysis of this record, we determine that the transaction was not supported with economic substance. We are satisfied that the Equipment purchase price amount of $ 462,118 within petitioner's Purchase Agreement with Lease Pro was a fair market value on the date of the transaction. [13] We are not persuaded that the fair market value was in excess of such amount as represented by Cornwell. The record indicates that the B7882 Input/Output *705 Processor Module is generally sold by Burroughs in configuration with the B7800 PCC Peripheral Control Cabinet and the B7800 AC Power Cabinet as evidenced by the Burroughs Bill of Sale to Utilities Leasing. Cornwell was aware that petitioner purchased the B7882 and peripheral units in configuration. Nonetheless, Cornwell increased the Burroughs list price by $ 104,594 to include such peripheral equipment in the fair market purchase price even though his report indicates that such equipment is generally sold in configuration with the B7882. [14] Such increase was clearly not warranted. We believe the inclusion of such separately priced items within his valuation to be a deliberate attempt to inflate the fair market value of the Equipment. Furthermore, Cornwell represented within his report in support of the residual value opinion therein that in January of 1985 the Burroughs list price for the B7882 Input/Output Processor was $ 485,224, an amount in excess of the Burroughs list price in December of 1980. At trial, Cornwell testified that the B7882 was no longer manufactured as of January of 1985 and that such list price was the Burroughs list price to make available the B7882 to *706 a buyer from "captive systems," such as Burroughs equipment used by the manufacturer itself. In our view, availability from "captive systems" is synonymous with obsolete equipment not readily marketed. We also find the statement by Cornwell that in January of 1985 the Burroughs list price was $ 485,224 to be misleading. Cornwell provided no contingent rent opinion evidence as to the amount of rent petitioner might reasonably expect to receive during the Interim Revenue period of the Revenue Sharing Agreement. Cornwell's view that the Equipment would retain 20 percent residual value at the termination of the Owner Lease is not supported by the record. For such reasons, we did not find Cornwell to be a credible witness. *707 Morgan determined the Burroughs list price of the Equipment to be $ 462,118. However, she reduced the list price by 25 percent because petitioner purchased used equipment not eligible for the investment tax credit. While such analysis is not flawed, we attribute some value to the fact that petitioner purchased an arranged leveraged lease subject to an end user commitment. See Mukerji v. Commissioner,87 T.C. at 965. Consequently, we find that petitioner paid fair market value for the Equipment; however, petitioner certainly did not receive a below fair market price for the Equipment. We must determine whether a realistic opportunity of profit exclusive of tax benefits existed at the time of entry in to the transaction. Because no cash flow to petitioner was generated by the amortization of the Installment Note, we focus on the Interim Revenue provisions of the Residual Sharing Agreement concerning renewal rents and the Residual Revenue provisions of such Agreement concerning the lease or the sale of the Equipment at the termination of the Owner Lease. As stated, we find the testimony of Cornwell that in December of 1980 it was reasonable to expect a 20 *708 percent residual value of the Equipment at the termination of the Owner Lease in December of 1988 to be unsupported by the record in this case. Cornwell expressed no opinion as to the Interim Revenue to be expected to commence in December of 1986 was a realistic opportunity in December of 1980. Cornwell states that "commonplace residuals exceeding 20 percent after eight years and useful lives of nine to ten years [were] found in 1980 as typical." We are simply not persuaded that in December of 1980 the prudent investor would expect the B7882 Input/Output Processor Module to retain 20 percent residual value as such computer equipment was introduced primarily as a peripheral device to enhance the capacity of the pre-existing B7700 computer system and to provide "an object code compatible" feature to the B7800 computer system. According to Morgan, the B7700 Computer System was introduced in May of 1973. The B7800 Computer System did not represent a new family or generation of a computer system for Burroughs. Cornwell stated that the B7807 introduced the B7800 Computer System in July of 1979 and "was object code compatible with its predecessor, the B7700, and offered new throughout *709 standards primarily on the basis of newly designed Input/Output Processor, the B7882." Cornwell stated that in July of 1979 it was generally known within the industry that follow-up models of the B7800 Computer System were to be introduced within the next 24 months. In fact, the B7830 Computer System and the B7850 Computer System were introduced in 1981 with newly designed central processors operated with the B7882 Input/Output Processor. The End User had installed in the B7821 subject to a scheduled five-year lease term to terminate June 26, 1985, with an early termination provisions to commence on June 27, 1983. We are unpersuaded that it was reasonable to expect the End User to maintain the B7821 with the follow-up enhanced B7830 and B7850 systems expected to be available. We note that the record indicates Burroughs had approximately a ten percent market share. The record does not indicate that an active secondary market for Burroughs equipment existed. Furthermore, the record is not persuasive as to whether the B7882 Input/Output Processor would be expected to be an item of significant residual value as of the termination of the Owner Lease in December of 1988. Cornwell *710 maintained that the computer equipment market was stable in 1980 such that residual forecasting was predictable. This record clearly indicates that industry conditions were not stable during 1980. Within his report, Cornwell included a residual valuation graph of the B7830 and B7850 prepared in 1984 which indicates a June, 1988 residual value for the B7830 of $ 50,000. The graph also indicates that in June of 1984 the B7830 residual value was $ 400,000. Cornwell contradicts the graph with his statement in the report that the last B7830 bid in June of 1984 was $ 200,000. We are perplexed by the obvious inconsistency concerning the June, 1984 residual value testimony by Cornwell. We note that the relevance of such testimony is questionable as such data was not available to the December, 1980 investor. The limited relevance is purportedly to demonstrate the prognostication of residual values in December of 1980 were done in a period of stable product introductions and that the events of the period 1980 through 1985 were not foreseeable. We disagree. The new product developments of the B7830 and B7850 were expected as testified to by Cornwell. Furthermore, the turmoil of the computer *711 equipment marketplace was evident in 1980 as demonstrated by product introductions of the industry leader IBM which had announced the IBM 3030 series in 1978, the IBM 4300 series in 1979, and the IBM H series in 1980. Cornwell was not persuasive as to the asserted insulation of Burroughs equipment from competitive pressures due to customer loyalty to Burroughs equipment and the absence of plug compatible competition where Burroughs has a limited market share of ten percent. The "wedge pricing" strategy that large computer systems demand a higher price/performance ratio is of little significance in contrast to the dramatic introductions of new products expected as of December, 1980 including the expected Burroughs introduction of the B7830 and B7850 Computer Systems. Based on the foregoing, we are simply not persuaded the prudent investor in December of 1980 would expect a residual value of the Equipment to be 20 percent and a useful life of eight to ten years. The record provides an inadequate basis for our determination of an alternative value. [15] Consequently, we find that petitioner's computer equipment transaction was devoid economic substance and is to be disregarded for *712 Federal income tax purposes. We have determined that petitioner has not satisfied the burden of proof necessary to establish that the Equipment would be of sufficient residual value to imbue the transaction with economic substance. We would be remiss if we failed to comment on the substance of the Remarketing Agreement and Residual Sharing Agreement interests retained by Finalco. We find in this respect essentially the same transaction as in Rice's Toyota World, Inc. It is obvious that all of the economic benefits of this leveraged transaction, other than the *713 tax benefits, were retained by Finalco. In Rice's Toyota World, Inc., Finalco retained a 30 percent in all revenue generated from the equipment after the original term of the taxpayer's lease. In this instance, the Remarketing Agreement and purportedly the Residual Revenue provisions of the Residual Sharing Agreement are couched in contingent terms dependent upon Finalco's services. We discern no substantive difference between the instant case and the facts in Rice's Toyota World, Inc. relative to the retained interest of Finalco. It is axiomatic in the law of Federal taxation that "A given result at the end of a straight path is not a different result because reached by following a devious path." Minnesota Tea Co. v. Helvering,302 U.S. 609, 613 (1938). With regard to the structuring and the substance of the interest retained by Finalco, the instant case presents the tune of Rice's Toyota World, Inc. with an insignificant change in the lyrics. By amendment to answer, respondent asserts the increased rate of interest provisions of section 6621(c) attributable to tax-motivated transactions. Respondent bears the burden of proof. Rule 142(a); Rose v. Commissioner,88 T.C. 386 (1987); *714 Zirker v. Commissioner,87 T.C. 970, 981 (1986). Section 6621(c) provides for an interest rate of 120 percent of the adjusted rate determined under section 6621(b) where there is a substantial underpayment in any taxable year attributable to one or more tax-motivated transactions. A substantial underpayment exists where such underpayment attributable to a tax-motivated transaction exceeds $ 1,000. Sec. 6621(c)(2). Section 6621(c) is applicable solely with respect to interest accruing after December 31, 1984, even though the transaction was entered into prior to the date of enactment of section 6621(c). Solowiejczyk v. Commissioner,85 T.C. 552 (1985), affd. per curiam without published opinion 795 F.2d 1005 (2d Cir. 1986). Respondent asserts the provisions of section 6621(c) are applicable because the transactions at issue are defined as tax-motivated transactions where losses were disallowed by reason of section 465(a). Sec. 6621(c)(3)(A)(ii). We have determined that the Equipment transactions were tax-motivated schemes devoid of *715 economic substance. Section 6621(c)(3)(A)(v) was added by Congress and specifically includes within the definition of tax-motivated transactions "any sham or fraudulent transactions." [16] We have previously determined that "any sham or fraudulent transactions" within the meaning of section 6621(c)(3)(A)(v) includes a transaction which lacked subject profit motive and which was without economic substance. Patin v. Commissioner,88 T.C. 1086, 1128-1129 (1987). We have recently determined that the presence of profit motive does not preclude the determination that a transaction lacks economic substance and is, therefore, a sham. Cherin v. Commissioner, 89 T.C.    (Nov. 23, 1987). In this case, we determined that petitioner did not manifest a subjective profit motive and the Equipment transactions were not supported with economic substance. Consequently, petitioner is liable for additional interest on the substantial underpayment of tax attributable to a tax-motivated transaction within the meaning of section 6621(c)(3)(A)(v) where the Equipment transactions are transactions determined to be shams or fraudulent transactions. *716 Decision will be entered for the respondent.
Footnotes
1. Unless otherwise indicated, all sections referred to are section of the Internal Revenue Code of 1954, as amended and in effect during the years in question, and all rules referred to are rules of the Tax Court Rules of Practice and Procedure. ↩
2. Subsec. (d) of sec. 6621↩ was redesignated subsec. (c) and amended by the Tax Reform Act of 1986, Pub. L. 99-514, sec. 1511(c)(1)(A)-(C), 100 Stat. 2744. We use the reference to the Internal Revenue Code as redesignated and amended. 3. The use of such terms as "purchase," "lease" and other like words does not imply that we consider the underlying transaction to be in fact construed as a "purchase" or "lease" for Federal income tax purposes. We probe beyond the labels given by the parties to determine whether an actual economic investment existed. Rice's Toyota World, Inc. v. Commissioner,81 T.C. 184, 210 (1983), affd. on this ground 752 F.2d 89↩ (4th Cir. 1985). 4. A set of form documents was reviewed prior to the execution of the One Page Agreement and references were made to such forms to be executed at a later date when formal preparation would be completed. ↩
5. Because petitioner paid $ 75,000 in cash instead of installments pursuant to the Recourse Note, petitioner would receive 100 percent of any re-leasing revenue after the 72nd month of the Owner Lease until he had received 120 percent of his net equity, specified to be $ 462,118, pursuant to the Interim Revenue Sharing Provisions of the Residual Sharing Agreement as discussed herein. If petitioner made the $ 75,000 payment according to the terms of the Recourse Note, he would receive only 50 percent of any re-leasing revenue after the 72nd month of the Owner Lease as represented on the One Page Agreement. ↩
6. The End User Lease provided for annual rent of $ 78,518.36 for the Original Term of the Owner Lease which terminated June 26, 1985, and which provided the End User an option to renew for one year at no cost. We find a fair inference to be that rental renewals would not nearly approximate 120 percent of petitioner's original equity during the last 24 months of the Owner Lease. Based on our conclusion as to the facts and circumstances pursuant to which Finalco structured the terms of the agreements herein, we are quite surprised at the apparent largess Finalco bestowed upon petitioner with the inserting of the purchase price amount as petitioner's original equity as opposed to the net equity amount in the companion cases which was determined to be the amount of any cash and recourse note less cumulative cash flow. Our conclusion is that Finalco did not expect the Equipment to generate significant Interim Revenue and did not expect the Equipment to retain significant residual value. ↩
7. Cornwell set forth the Burroughs list price for the Equipment to be as follows: ↩
Burroughs
Quantity
Model
Description
List Price
1
B7882 IOP
Input/Output Processor
$ 462,118
3
B7800 PCC
Peripheral Control Cabinet
99,300
1
B7800 AC
Power Cabinet
5,294
TOTAL
$ 566,712
8. The Tax Summary provided by Finalco computed depreciation by electing the half year convention and 150 percent declining balance method of depreciation utilizing a five-year useful life. ↩
9. The companion cases are: Larsen v. Commissioner, 89 T.C.    (1987); Sturm v. Commissioner,T.C. Memo. 1987-625; Moore v. Commissioner,T.C. Memo. 1987-626; Casebeer v. Commissioner,T.C. Memo. 1987-628↩. 10. Carlson v. Commissioner,T.C. Memo. 1987-306↩. 11. The presence of business purpose does not entitle a transaction to be recognized for Federal tax purposes where objective indicia of economic substance indicating a realistic potential for economic profit are not manifest. Cherin v. Commissioner,↩ 89 T.C.    (Nov. 23, 1987). 12. Dobbs v. Commissioner,T.C. Memo. 1987-361; Kaufman v. Commissioner,T.C. Memo. 1987-350↩. 13. Although not material to our determination of economic substance, we are impelled to find that Lease Pro served no legitimate business purpose in the transaction and was inserted into the chain of title by Finalco solely for tax considerations. See Bussing v. Commissioner,88 T.C. 449 (1987), supplemental opinion 89 T.C.    (Nov. 24, 1987); Coleman v. Commissioner,87 T.C. 178, 206 (1986), affd. per curiam 833 F.2d 303 (3d Cir. 1987); Tolwinsky v. Commissioner,86 T.C. 1009↩ (1986). 14. ↩
Quantity
Model
Burroughs List Price
3
B7800 PAC
$ 99,300 1
B7800 AC
5,294  $ 104,595
15. Morgan determined a zero residual value as of the commencement of the Interim Revenue provision and the termination for the Owner Lease. Based on this record, we found Morgan more credible with respect to the fair market value of the Equipment in December of 1980, the Interim Revenue valuation, and the residual value at the termination of the Owner Lease. While we recognize that a prudent investor may have expected some residual value of the Equipment at issue, such valuation is not demonstrated within this record and was without question insufficient to imbue the transaction at issue with economic substance. ↩
16. Pub. L. 99-514, sec. 1535(a), 100 Stat. 2085, 2750. ↩