FRANK AND IRENE S. MELE, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Mele v. Commissioner
Docket No. 24918-85.
United States Tax Court
T.C. Memo 1988-409; 1988 Tax Ct. Memo LEXIS 442; 56 T.C.M. (CCH) 1; T.C.M. (RIA) 88409; September 1, 1988. S. Sidney Mandel for the petitioners. Roland Barral, Lawrence A. Hock, and Vincent J. Guiliano for the respondent. WILLIAMS
MEMORANDUM FINDINGS OF FACT AND OPINION WILLIAMS, Judge: The Commissioner determined deficiencies in petitioners' Federal income tax for the taxable years 1980, 1981, 1982 and 1983 and additions to tax as follows: Additions to Tax
Year
Deficiency § 6653(a) [1] § 6653(a)(1) § 6653(a)(2) § 6661
1980
$ 92,017.00
$ 4,601.00
-
-
-
1981
63,714.00
-
$ 3,186.00
*
-
1982
3,842.00
-
192.00
*
-
1983
68,044.00
-
3,402.00
*
$ 6,804.00
*443 The parties have entered into a Stipulation of Partial Settlement. The remaining issues for our decision relate to the taxable years 1982 and 1983 and are (1) whether petitioners' purported purchase of certain computer equipment had economic substance for Federal income tax purposes; [2] and (2) whether additions to tax pursuant to sections 6653(a)(1), 6653(a)(2) and 6661 are warranted. FINDINGS OF FACT Some of the facts have been stipulated and are so found. Petitioners Frank and Irene S. Mele are husband and wife who resided at Sarasota, Florida when they filed their petition in this case. At the time of his retirement in 1981, Frank Mele ("petitioner") was an electrical engineer and executive vice president of Gibbs and Hill, an engineering firm. The deficiencies remaining in issue are attributable entirely to respondent's disallowance of depreciation and interest deductions arising from petitioner's purported *444 purchase of a 10-percent interest in certain International Business Machines Corp. ("IBM") computer equipment. This computer equipment consists of an IBM Unit 3081 mainframe with attachments (the "Equipment") originally owned by Citibank Aktiengeselleschaft ("CAG"), a West German company. On August 24, 1981, CAG entered into an agreement with Grundig, A.G. ("Grundig"), also a West German company, to lease the Equipment for a 54-month period commencing on January 1, 1982 (the "User Lease"). On various dates between November 26, 1981 and December 12, 1981, CAG purchased the Equipment from IBM for $ 4,033,000. On April 30, 1982, a series of sales and leasebacks of the Equipment occurred. The principal parties to the agreements were CAG, Citibank North America ("CNA") and Systems Leasing, Inc. ("SLI"), a New Jersey corporation in the business of arranging equity financing for leased assets. All of the agreements were subject and subordinate to the User Lease in place between CAG and Grundig and were governed by the laws of the State of New York. The User Lease is not in evidence, and its terms are unknown to the Court. CAG first sold the Equipment to CNA, which immediately leased *445 it back to CAG under a net lease (the "Bank Lease"). The purchase agreement between CAG and CNA is not in evidence, and we do not know the purchase price. The Bank Lease, however, provides "that each and every payment of Fixed Rent hereunder shall be made by [CNA] crediting for the account of [CAG] an amount equal to the monthly installments of principal and interest due to [CAG] from [CNA] under the Installment Note, when and as the same become due." The rental payments and purchase installments in this transaction between two related parties thus offset one another. The Bank Lease further provides that CAG, as lessee, may terminate the lease if the assumption on which the lease is based, i.e., that there be no taxes imposed on the lease or installment payments, changed. Consequently, if the offset were interrupted, the Bank Lease could be terminated. Because the purchase agreement between CAG and CNA is not in evidence, we do not know what effect termination of the Bank Lease would have on the rights and obligations under the purchase agreement. [3]
*446 CAG, as lessee, agreed to pay all taxes, fees, imposts, levies, duties, and assessments relating to the Equipment. CAG also bore the risk of loss of or damage to the Equipment for the lease term and agreed to carry insurance to cover any such loss or damage. CAG was obligated to pay rent regardless of any loss of use of the Equipment unless the loss was caused by CNA's gross negligence or willful misconduct. The lease term was 96 months with no rent due for the first 17 months and rent of $ 76,898.77 due monthly in advance on the first day of each month thereafter. CAG was permitted to sublease the Equipment and after the expiration of the underlying User Lease, CAN was entitled to 50 percent of all proceeds from subleases net of expenses. At the same closing at which CNA purchased its interest in the Equipment and leased it back to CAG, CNA simultaneously sold its interest in the Equipment to SLI for $ 4,033,000 and leased it back pursuant to the Master Lease. CNA is the lessee under the Master Lease. CNA's leaseback of any interest in the Equipment under the Bank Lease is thus a sublease under the Master Lease. This sublease cannot stand if the Master Lease terminates. The *447 Bank Lease would thus terminate by operation of law in the event the Master Lease between CNA and SLI, see infra, were terminated for any reason. SLI paid CNA $ 446,366 cash and executed a promissory note for $ 3,586,634 bearing an interest rate of 11.89 percent and payable on the fifteenth day of each month in arrears as follows: Months 1-16
$    0     Months 17-95
$ 76,898.77
The installments payable by SLI to CNA on the purchase of the Equipment were identical to the rentals due CAG from CNA pursuant to the Bank Lease. In the event that CNA elected to terminate the Master Lease, see infra, SLI could, on demand, require CNA to repurchase the Equipment within 15 days. The repurchase price would be an "amount equal to the entire unpaid balance of principal and accrued interest then remaining due under the Installment Note" plus an amount of "Basic Additional Consideration" which varied depending on when the repurchase option was exercised. [4]
*448 Subject to the User Lease and the Bank Lease, SLI also had the right to sell its interest in the Equipment and to assign its rights under the Purchase Agreement. All rights under the Master Lease were transferable to assignees of either party. If SLI were to default on its payments after selling its interest in the Equipment, the buyer would have the option to remedy the default by making the required payments. If the Buyer did so, SLI's obligation to make those payments to CNA would be discharged. [5]
TThe Master Lease pursuant to which SLI leased the Equipment back to CNA was a net-net-net lease for a term of 96 months with payments due in advance on the fifteenth day of each month as follows: Months 1-17
$    475.00
Months 18-54
77,373.77
Months 55-96
76,898.77
CNA's total rental obligation for the first 17 months of the Master Lease was thus $ 8,075 ($ 475 X 17). For the next 37 months, CNA's total rent was $ 475 per month greater than SLI's offsetting obligation on the installment note and for the final 42 months, *449 CNA's rental obligation was offset completely by SLI's installment obligation. In addition to rent payments, SLI was entitled to 50 percent of the net proceeds of any sublease of the Equipment by CAG after the expiration of the User Lease and to the residual value of the Equipment on expiration of the Master Lease. SLI had the right to terminate the Master Lease at any time upon 60 days' prior written notice to CNA and payment of certain "termination charges." [6] The Bank Lease would then terminate by operation of law, and CNA would assign to SLI CAG's rights under the User Lease. If CNA defaulted on rental payments under the Master Lease, SLI had the option to terminate the lease. That option, *450 however, was largely illusory. Except to the extent of $ 25,650 payable over 54 months, CNA's rental obligation was offset by SLI's installment obligation. For CNA this obligation was de minimis and in effect meant that there were no rental payments on which CNA could conceivably default. As lessee under the Master Lease, CNA purportedly bore the risk of loss of or damage to the Equipment for the lease term. In reality, however, CNA had no significant risks or obligation pursuant to its sale-leaseback transactions with CAG or SLI. As we have previously found, the Bank Lease between CNA and CAG resulted in a wash, with rental obligations completely offset by purchase installment obligations. Pursuant to the Bank Lease, CAG retained all risk of loss. Pursuant to the Master Lease between CNA and SLI, CNA was obligated to pay rent only to the extent of $ 25,650, the amount by which its rental obligation exceeded SLI's installment obligation. If SLI terminated the Master Lease, CNA's obligation was to assign CAG's rights under the User Lease to SLI. CNA would thereby remove itself from the transaction. [7]
SLI and CNA also entered into a Remarketing *451 Agreement pursuant to which CNA agreed to act as SLI's exclusive marketing agent for the Equipment after the expiration of the Master Lease or its sooner termination. For its services, CNA would receive 10 percent of the net proceeds from a sale or lease of the Equipment. SLI could terminate the Remarketing Agreement at will upon 15 days' notice to CNA. SLI's right to terminate the Remarketing Agreement, however, was illusory. There is no evidence that SLI or petitioner, who acquired SLI's rights under the Master Lease, had any remarketing knowledge or skills. Furthermore, petitioner had not investigated the rental market for used computer equipment. We thus do not believe there was any prospect that they would exercise their right to terminate the Remarketing Agreement. SLI next sold a 10-percent interest in the Equipment to petitioner subject and subordinate to the rights of Grundig pursuant to the User Lease and of CNA pursuant to the Master Lease. The documents relating to the sale were dated as of April 30, 1982. The closing, however, did not take place until approximately June 15, 1982, when petitioner tendered a check to SLI. The purchase price was $ 403,300. Petitioner *452 paid $ 88,700 cash at closing, $ 75,400 of which represented prepaid interest, and executed a note entitled "Full Recourse Installment Promissory Note" (the "Installment Note") in the amount of $ 390,000 bearing an interest rate of 14.5 percent. The Installment Note was payable over 95 months in arrears on the fifteenth day of each month as follows: Month 1-16
-0- Months 17-95
7,689.88
If CNA elected to terminate the Master Lease, Petitioner could require SLI to repurchase his 10-percent interest for an "amount equal to the entire unpaid balance of principal and accrued interest then remaining due under the Installment Note" plus an amount of "Basic Additional Consideration." [8] If SLI defaulted on its obligation to make installments payments to CNA pursuant to the promissory note executed in connection with SLI's purchase of the Equipment from CNA, petitioner had two options. He could make the payments due to CNA on SLI's behalf and offset those payments against payments due on the Installment Note. In the alternative, he could do nothing and the principal balance and accrued interest would still be reduced by the amount SLI was in default. In either case, *453 once CNA gave petitioner notice of SLI's default, SLI's obligation to CNA for that payment would be discharged. Petitioner's interest in the Equipment entitled him to 10 percent of the rental payments due from CNA pursuant to the Master Lease. Bank accounts were set up through which Joseph A. Piscitell, petitioners' accountant and investment adviser, claimed petitioner's payments to SLI and CNA's rent payments to petitioner were automatically debited and credited. [9] Petitioner received the following amounts each month as rent: Months 1-17
$    47.50
Months 18-54
7,737.38
Months 55-96
7,689.88
CNA's rental obligation exceeded petitioner's installment obligation for the first 54 months by $ 47.50 per month for a total of $ 2,565. For the remainder of the lease term, the rental and installment obligations completely offset each other. To the extent that any payments were actually debited and credited as Piscitell claimed, we do not believe that the amounts transferred exceeded $ 2,565. *454 Petitioner's total obligation under the terms of the purchase agreement between petitioner and SLI, including the installment payments and payment at closing, amounted to $ 696,200.52, and he was owed rental payments of $ 610,065,52, resulting in a net out-of-pocket cost of $ 86,135. Petitioner was also entitled to a 5-percent interest in the net proceeds of any second rental income after the expiration of the User Lease and 9-percent interest in the residual value on sale of the Equipment. After the expiration of the User Lease, CAG was successful in leasing part of the Equipment for 36 months to an unrelated party. Petitioner's share of the second rental income was $ 335 per month, for a total additional rental of $ 12,060. Prior to closing on the sale, petitioner and SLI agreed to submit opinions of their respective counsel concerning the legal effect of the purchase. The opinions do not discuss the tax ramifications of the transaction. Petitioner invested in the Equipment on the advice of Piscitell. Piscitell had worked with petitioner's employer Gibbs and Hill for several years, first as an associate with an accounting firm of which Gibbs and Hill was a client and *455 later through his own firm. The primary work that Piscitell performed for Gibbs and Hill was tax and financial planning for company executives, including petitioner. Piscitell had previously arranged several computer leasing transactions involving SLI, including transactions on behalf of Gibbs and Hill executives. Piscitell had prepared petitioners' tax returns in previous years and in 1981 or 1982, petitioner approached Piscitell about planning for his retirement. Petitioner wanted to invest in something that would provide him with income for his retirement. A group of engineers at Gibbs and Hill had recently entered into a computer leasing transaction with SLI and petitioner expressed an interest in making a similar investment. Piscitell performed an investigation before recommending that petitioner purchase an interest in the Equipment. He selected IBM equipment because of the company's excellent reputation. In addition, he spoke to a computer expert and hired attorneys to review the sale-leaseback documents. Piscitell negotiated with CNA and SLI to ensure that the investment met petitioner's needs. Piscitell sought an investment that would make economic sense, provide *456 rental payments sufficient to amortize his debt, and give petitioner control over the purchased asset. It is not clear what "control" Piscitell thought petitioner would acquire from the purchase of a 10-percent interest in the Equipment subject or subordinate to pre-existing leases and other investors' interests. The main risk that Piscitell saw in the investment was that if CNA did not make rental payments, petitioner would nevertheless be obligated to make payments on his note to SLI. Piscitell testified that he did not consider this to be a significant risk because CNA was an excellent credit risk. To "protect" petitioner Piscitell negotiated for him in the Purchase Agreement the right to exercise SLI's right under the Master Lease to cancel the Master Lease if he did not like the way CNA was performing. We agree that there was no significant risk to petitioner in the investment primarily because of CNA's credit rating, not because of petitioner's right to cancel the Master Lease. Under the Master Lease, CNA's obligation to make rental payments was offset by SLI's installment obligations except to the extent of $ 25,650 and its obligation under the Bank Lease was completely *457 offset by CAG's rental obligation. There was thus virtually no chance of CNA's defaulting on its payment obligations. Petitioner's right to cancel the Master Lease if he did not like the way CNA was performing was also illusory. CNA had no performance obligation under the Master Lease other than to pay a de minimis amount of rent. To decide whether petitioner could expect to earn income from an investment Piscitell reviewed an appraisal of the Equipment prepared for CNA or SLI and compared it against his own calculations. He reviewed the amount of residual income petitioner was projected to receive on the sale of the Equipment at the end of the Master Lease term and the second rental income petitioner could expect to receive in the period between the expiration of the User Lease and the expiration of the Master Lease. He concluded that petitioner would double the money he put into the transaction and thus advised petitioner that it would be a good investment. Piscitell's calculations are not in evidence. The appraisal report which Piscitell reviewed was prepared by John R. Wilkins, president of Communigraphics, Inc. ("Communigraphics"). Wilkins did not testify at the trial *458 and his report was received into evidence for the limited purpose of showing Piscitell's efforts and the extent of his review of anticipated financial benefits. The Court specifically did not receive Wilkins' report as evidence of the fair market value of the Equipment. The appraisal is a summary of conclusory assertions and provides no substantial basis for measuring the soundness of projected residual values. Wilkins determined that the residual value of the Equipment at the end of the 54-month User Lease would be $ 1,815,000 and at the end of the 96-month Master Lease would be $ 806,700. The appraisal, prepared in March 1982, provides in relevant part: III. VALUATIONS GRUNDIG AG
The IBM 3081 Central Processor and associated perhipherals are among IBM's latest models in their price and capacity ranges, and should have an economic life of not less than twelve years. Below is the anticipated residual value for the equipment described in Exhibit A upon the expiration of the initial user lease term and upon the expiration of 96 months: June, 1986 -
$ 1,815,000
March, 1990 -
806,700
The user lease is for 51 months at a rental of $ 105,138 (based on a *459 currency conversion rate of .43) per [month]. [10] Using the existing debt interest rate of 17.37% per annum, the present value of the user lease is $ 3,827,984. In our opinion, the assessed value of the equipment described in Exhibit A should be the sum of the present value of the user lease plus the present value of the residual value of such equipment upon expiration of the initial user lease term. We have discounted such residual value at 17.37% and calculated the appraised value as follows: Present value, user lease:
$ 3,827,984
Present value, residual:
872,103
Sum of present values:
4,700,087
Since the sum of the appraised values is higher than the Acquisition Cost of the Equipment, we *460 will limit our appraisal to such Acquisition Cost. Appraised Value: $ 4,033,000 Petitioner was not a computer expert but had some knowledge of which computers performed best. He briefly reviewed the documents Piscitell gave him and concluded that the Equipment would be a good investment. He testified that he expected to earn profit from the rental payments and payment of his share of the residual value on the sale of the Equipment. He understood that at the end of the User Lease he would have a net loss that would have to be made up by the Equipment's residual value or second rental income. S. Paul Blumenthal also appraised the Equipment and testified on behalf of respondent. Blumenthal is the Senior Vice President of American Computer Group and managing officer of American Technology Appraisal Service ("ATAS"), a division of American Computer Group. ATAS appraises, values and determines future residual values for all types of high technology equipment including computers. The appraisal Blumenthal prepared for this case was based on reports prepared in 1982 for other clients in valuing the same the type of equipment. Blumenthal based his determination of the Equipment's *461 residual value at the end of the Master Lease as of 1982 on contemporaneous 1982 data and predictions of anticipated technological advancements over the foreseeable future. He reviewed the documentation for the concurrent sale-leasebacks of the Equipment, economic conditions in the industry, the market for used computers and the pace of technological advancement. On the basis of his appraisal, Blumenthal concluded that the Equipment had a fair market value as of April 30, 1982, of $ 4,243,601. He further concluded that primarily as a result of obsolescence, the Equipment would have no marketable value at the end of the Master Lease. Blumenthal calculated that the Equipment and petitioners' 10-percent interest in the Equipment which he purchased for $ 403,300 would decline in value over the 96-month term of the Master Lease as follows: Value of
% of
Value
Petitioner's
List
Date
of Equipment
Interest
Price
April 1982
$ 4,243,601
$ 411,366
102%
April 1983
3,079,365
298,442
74 April 1984
2,371,943
229,881
57 April 1985
1,498,069
145,188
36 April 1986
998,713
96,792
24 April 1987
499,356
48,396
12 April 1988
249,678
24,198
6 April 1989
83,226
8,066
2 April 1990
-0-  -0- -0- *462 Although many of the technological changes he predicted have not occurred, Blumenthal's report was thorough, well-prepared and persuasive. OPINION The primary issue we must decide is whether petitioners are entitled to depreciation and interest expense deductions arising from petitioner's interest in sales and leasebacks of an IBM computer system. Respondent argues that the sale to petitioner was a sham and should be disregarded for Federal income tax purposes because it lacked economic substance and was devoid of business purpose. In the alternative respondent contends that petitioners' deductions should be limited pursuant to sections 183 and 465 because petitioner lacked the requisite profit motive and was not at-risk for the full amount of the purchase price. Because of our decision on the economic substance of the transaction, we do not decide the merits of respondent's other grounds for denying the claimed deductions.
Respondent's assertion that the sale was a sham is presumptively correct and petitioners bear the burden of proving the contrary. Rule 142(a), Tax Court *463 Rules of Practice and Procedure; Welch v. Helvering,290 U.S. 111 (1933). A transaction will not be disregarded for Federal income tax purposes simply because it is motivated by considerations of reducing tax. Frank Lyon Co. v. United States,435 U.S. 561, 581 (1978); Gregory v. Helvering,293 U.S. 465 (1935); Rice's Toyota World, Inc. v. Commissioner,81 T.C. 184, 196 (1983), affd. on this issue 752 F.2d 89 (4th Cir. 1985). A sale-leaseback is a sham and will be ignored for Federal tax purposes, however, if it is determined "that the taxpayer was motivated by no business purpose other than obtaining tax benefits in entering the transaction, and that the transaction has no economic substance because no reasonable possibility of a profit exists." Rice's Toyota World, Inc. v. Commissioner,725 F.2d 89, 91 (4th Cir. 1985), affd. in part, revg. in part 81 T.C. 184 (1983). Our inquiry into business purpose and economic substance is inherently factual. Larsen v. Commissioner,89 T.C. 1229 (1987); James v. Commissioner,87 T.C. 905 (1986). *464 In deciding whether a transaction is devoid of economic substance, the taxpayer's subjective statement as to his profit motive in entering into a transaction is relevant, but we place greater emphasis on objective facts demonstrating a realistic potential for profit. Cherin v. Commissioner,89 T.C. 986, 992 (1987). A realistic potential for profit exists "when the transaction is carefully conceived and planned in accordance with standards applicable to the particular industry, so that judged by those standards the hypothetical reasonable businessman would make the investment." Cherin v. Commissioner, supra at 994. In the instant case, we conclude that no realistic potential for profit existed and that petitioner could not have been motivated by any business purpose. In fact, the principal purpose of this arrangement was the avoidance of Federal income tax. The transaction was, therefore, devoid of economic substance and will be ignored for Federal income tax purposes. Petitioner is an intelligent individual knowledgeable about business matters. In *465 addition, he had some knowledge of computers. Although he required advice in deciding whether to invest in the Equipment, he was not justified in relying exclusively on that advice because critical aspects of the transaction were not analyzed. Petitioner purchased a 10-percent interest in the equipment for $ 403,300. His total payments to SLI at closing and pursuant to the Installment Note were $ 696,200.52 while his share of rental income was $ 610,065.52. The difference, $ 86,135, represents the loss he had to make up from his share of the Equipment's residual value at the end of the Master Lease and his share of any second rental income from CAG's releasing the Equipment after the expiration of the User Lease to break even on the transaction. See Estate of Thomas v. Commissioner,84 T.C. 412, 429 (1985). In analyzing the economic potential of the transaction for petitioner, Piscitell reviewed an appraisal of the Equipment prepared by John B. Wilkins of Communigraphics, Inc. and compared Wilkins' conclusions with his own figures. Piscitell calculated that petitioner would double the money he put into the transaction. Piscitell's calculations, however, *466 are not in evidence and we can see no way for petitioner to "double his money" on this transaction except, perhaps, through tax savings. Wilkins' appraisal was prepared for either SLI or CNA in connection with the sale-leaseback transactions in issue, and Piscitell considered it unnecessary to commission an independent appraisal. We admitted Wilkins' appraisal solely as evidence of Piscitell's efforts in investigating the transaction and not as evidence of the fair market or residual value of the Equipment. As discussed below, petitioner could not reasonably have expected to profit from his investment, even assuming that Wilkins' appraisal represented a valid estimate of the Equipment's residual value. We conclude that petitioner was not justified in relying on it or on Piscitell's economic analysis or investigation. Wilkins concluded that the anticipated residual value of the Equipment at the expiration of the 96-month Master Lease would be approximately $ 806,700. Petitioner was entitled to 9 percent of the asserted residual value, or, assuming no expenses for remarketing, $ 72,603. CNA's fee under the Remarketing Agreement equal to 10 percent of the Equipment proceeds after *467 payment of all expenses in connection with a sale or lease would further reduce petitioner's share of the Equipment's residual value to $ 65,000 or less, leaving a $ 21,000 or more cash deficit to be recovered from second rental income. Petitioner testified that based on his review of the documents Piscitell gave him, he expected to earn a profit from rental payments and his share of the residual value on the sale of the Equipment. He further stated that he understood that the net loss at the end of the User Lease would have to be made up by the Equipment's residual value or second rental income. Although we found petitioner's testimony to be truthful, it was incomplete. It is not clear how petitioner could expect this transaction to possibly provide him with "income" when the overall pretax cash flow was negative. Petitioner could not recall whether he even read Wilkins' appraisal before investing although he knew that absent significant residual value, the transaction could not provide him with an economic, nontax profit. Based on Wilkins' appraisal, petitioner could not reasonably have believed that his share of the residual value would make the transaction profitable. *468 To the contrary, petitioner could only believe that he would experience a loss of a least $ 21,000. Consequently, we believe that a reasonable business decision could not be made on the basis of Wilkins' appraisal. Further, on its face Wilkins' appraisal was not a document worthy of reliance. Wilkins' appraisal is nothing more than a listing of unsupported conclusions as to the Equipment's value. If Piscitell and petitioner wanted an investment that would generate an economic profit for petitioner and not just tax benefits, they would have required more. Thus, petitioner could expect to earn a profit only if he believed he would receive significant income from leasing the Equipment after the User Lease expired. Petitioner had no grounds on which reasonably to believe that any rental income would be produced during the 42-month period after the User Lease expired and before the expiration of the Master Lease. Neither petitioner nor his accountant investigated the market for rentals of used IBM computers, and petitioner had no basis for concluding that CAG would be able to lease the Equipment after the User Lease expired. Instead, they relied on the summary assertion in Wilkins' *469 conclusory appraisal to justify their belief that "second rental" income would be generated by leasing the Equipment after the User Lease expired. In fact, CAG was able to lease only part of the Equipment for 36 months after the User Lease terminated. Petitioner's 5-percent share of second rental income was approximately $ 335 per month for a total of $ 12,060 after 36 months. Petitioner thus actually suffered a significant negative cash flow on his investment. He could not reasonably have anticipated any other result. Petitioner's decision to invest in the Equipment without investigating the potential for leasing it at the expiration of the User Lease despite Wilkins' appraisal showing that he would suffer at least a $ 21,000 loss absent significant second rental income also leads us to conclude that profit could not have been petitioner's motivation for investing in the Equipment. Petitioner presented no evidence of a significant market for rental of used computer equipment, and even assuming the projection of residual value on which he relied was reasonable (which we believe was not the case), he has not met his burden of proof. The only competent evidence of residual value *470 in the record is the well-prepared report of respondent's expert who projected the residual value of the Equipment at the end of the Master Lease to be zero. The transaction lacked economic substance and will be ignored for Federal income tax purposes. [11]
No reasonable prospect of profitability existed when petitioner purchased his interest in the Equipment from SLI. Petitioners thus are not entitled to the depreciation deductions claimed with respect to the Equipment. If the Full Recourse Installment Promissory Note that petitioner undertook to repay to SLI represented a valid obligation, however, then petitioner may deduct the interest paid on it. Rice's Toyota World v. Commissioner,752 F.2d 89, 95-96 (4th Cir. 1985), revg. *471 on this issue 81 T.C. 184 (1983); Rose v. Commissioner,88 T.C. 386, 423-424 (1987), on appeal (6th Cir., Dec. 14, 1987); see Bail Bonds by Marvin Nelson, Inc. v. Commissioner,820 F.2d 1543, 1549 (9th Cir. 1987), affg. a Memorandum Opinion of this Court. Petitioner purchased his interest in the Equipment from SLI for $ 403,300. He paid $ 88,700 cash at closing and executed an Installment Note for $ 390,000, payable over 95 months. Of the cash paid at closing, $ 13,300 represented a down payment on petitioner's interest in the Equipment and $ 75,400 represented prepaid interest on the Installment Note. The Installment Note provided that no payments were due for the first 16 months. It appears that the prepaid interest payment at closing, however, was the interest cost for the first 16 months of the Installment Note term. The case law allocates prepaid interest ratably over the 16 months. See Cole v. Commissioner,586 F.2d 747 (9th Cir. 1978), affg. 64 T.C. 1091 (1975), cert. denied 441 U.S. 924 (1979). This allocation results in a monthly charge of $ 4,712.50 for the first 16 *472 months of the Installment Note. Payments of $ 7,689.88 per month in arrears were then due for months 17 through 95. Interest on the Installment Note was payable at 14.5 percent and all payments were allocable first to interest and then to principal. All installments on the Note were payable to SLI. The Installment Note became effective on June 15, 1982, when petitioner tendered his check to SLI in the amount of $ 88,700. During the same period, petitioner was entitled to the following monthly rentals, payable in advance, representing 10 percent of rentals due from CNA to SLI under the Master Lease: Months 1-17
$    47.50
Months 18-54
7,737.38
Months 55-96
7,689.88
Over the term of the Master Lease and the Installment Note, petitioner thus owed and was entitled to receive the following amounts: Installment
Rent
Month
Due
Owed
Net Cost
Equity
$  13,300.00
$ (13,300.00)
1-16
4,712.50
$      47.50
(74,640.00)
17
7,689.88
47.50
(7,642.38)
18-54
7,689.88
7,737.38
1,757.50 55-95
7,689.88
7,689.88
-0-  96
-0-  7,689.88
7,689.88 TOTAL
$ 696,200.52
$ 610,065.52
$ (86,135.00)
Petitioner's *473 net out of pocket expense of $ 86,135 represents the $ 13,300 "equity" payment at closing and the $ 75,400 interest prepaid at closing less $ 2,565, the amount by which CNA's rental obligation exceeded petitioner's installment obligation. Petitioner's $ 607,500.52 of installments due on the Installment Note, would be fully offset by rental payments received from CNA. If SLI defaulted on its "payments" under the Master Lease, petitioner had two options, neither of which required him to incur any additional expense. Petitioner's first option was to make the payments to CNA on SLI's behalf and apply the amounts paid against the amount due to SLI under the Installment Note. Because of petitioner's second option, the possibility of the first option occurring was so unlikely as to be nonexistent. Petitioner's second option was to do nothing. In that case the Installment Note provides that the principal balance and accrued interest under the Note would be reduced by the amount SLI failed to pay to CNA, and SLI's obligation to CNA would also be discharged in that amount. The Installment Note, therefore, does not effectively impose personal liability on petitioner. Interest payments *474 on nonrecourse debt are deductible only if the amount of the debt is not greater than a reasonable value of the underlying property when the debt becomes due. The debt becomes "due" as the rental is offset against the installments. Respondent's expert, S. Paul Blumenthal, concluded that the Equipment would have no residual value at the end of the 96-month lease term. His report also shows a dramatic decline in value by the time installment obligations became "due." Although Mr. Blumenthal anticipated technological breakthroughs that did not occur, his report was the only evidence of reasonably anticipated value. Petitioner was required to make his first payment under the Installment Note on November 15, 1983. Blumenthal estimated that petitioner's interest in the Equipment would be worth $ 298,442 in April 1983 and $ 229,882 in April 1984. Interpolating the value of petitioner's interest as of November 1983, it was approximately $ 258,448. As of November 1983, petitioner owed $ 607,500.52 on the Installment Note ($ 7,689.88 X 79 months). The reasonable, projected estimate of value of the Equipment was thus not sufficient to ensure repayment of the debt. Consequently, the amount *475 of the debt did not reasonably approximate the value of the property when the "debt" would be required to be repaid. Consequently, the "debt" is illusory from the outset, and none of the interest "paid" on the Installment Note is deductible. Respondent determined additions to tax pursuant to sections 6653(a)(1) and 6653(a)(2) for the taxable years 1982 and 1983 pursuant to section 6661 for 1983. With regard to each of these additions to tax, petitioner has the burden of proof. Rule 142(a).
Section 6653(a)(1), as in effect in 1982 and 1983, provided for an addition to tax equal to five percent of an underpayment if any part of the underpayment was due to negligence or intentional disregard of rules or regulations. Section 6653(a)(2) imposed a further addition to tax equal to 50 percent of the interest payable on that portion of the underpayment of tax attributable to negligence or intentional disregard of rules and regulations. For purposes of section 6653(a), negligence is defined as lack of due care or failure to do what a reasonable and prudent person would do under the circumstances. *476 Neely v. Commissioner,85 T.C. 934, 947 (1985). We have found that petitioner purportedly purchased a 10-percent interest in a third-generation sale-leaseback of the Equipment without fully investigating the potential for earning a profit. A reasonable person motivated by concerns other than tax avoidance would have performed such an investigation. While the structure of the transaction that culminated in petitioner's purchase was complicated, the economic potential was readily discernible. On available evidence there plainly was no income potential, which petitioner testified was his chief goal. Further, the stated residual value did not support a conclusion that any potential for profit existed, and a reasonable, projected residual value (which petitioner did not seek) was even lower. Petitioner's (and Piscitell's) failure to investigate the rental market for leased computer equipment is not excusable here because the availability of the benefits claimed turned on the economic substance of the transaction and they knew it. [12] Petitioner was negligent in failing to analyze the economic potential of his purchase and, consequently, in concluding that the transaction *477 had substance for Federal income tax purposes. Petitioners are, therefore, liable for the additions to tax pursuant to section 6653(a)(1) and section 6653(a)(2) attributable to this transaction. [13]
Respondent also determined an addition to tax pursuant to section 6661 for the taxable year 1983. [14]Section 6661(b)(1)(A) provides that an understatement is substantial if the amount of the understatement for the year exceeds the greater of 10 percent of the tax required to be shown on the return for the taxable year, or $ 5,000. *478 If the deductions at issue are a "tax shelter item," the taxpayer must demonstrate that he "reasonably believe[d] at the time the return [was] filed that the tax treatment claimed [was] more likely than not the proper tax treatment of the items * * *." Section 1.6661-5(a)(1)(ii), Income Tax Regs. For purposes of section 6661 a "tax shelter" means a plan or arrangement the principal purpose of which is the avoidance of Federal income tax. Section 6661(b)(2)(C)(ii)(III); section 1.6661-5(b)(1), Income Tax Regs.
We have held that petitioner's purchase lacked economic substance because it lacked a reasonable potential for profit and the principal purpose of petitioner's investment was Federal income tax avoidance. This transaction was, therefore, a "tax shelter" within the meaning of section 6661. To avoid the addition to tax pursuant to section 6661, petitioner must, therefore, first prove that he reasonably believed that he was more likely than not to prevail in court on the deductions he claimed. The regulations require an analysis *479 either by the taxpayer or by a professional tax adviser that addresses the litigation risks of the taxpayer's position. Section 1.6661-5(d), Income Tax Regs.
Petitioner argues that he relied on an attorney who reviewed the transaction, his own research and Piscitell to conclude that his purchase was a good economic investment and that his tax treatment of the transaction was more likely than not the proper treatment. Petitioner gave us no analysis and did not disclose the subject inquiries of his "research." His conclusory generalizations are insufficient to satisfy the requirements of section 1.6661-5(d)(1), Income Tax Regs. Piscitell stated that he was familiar with the case law relating to computer leasing transactions and believed that the investment in the Equipment was valid for tax purposes. Piscitell's testimony, however, convinced us that he could not realistically be expected to express a reliable view on the hazards of litigation. Although petitioner sought the views of an attorney, the attorney expressed no views on the likelihood of success on the merits of any tax issue either in his opinion letter or in court. *480 The record is barren of any evidence that a professional tax adviser gave petitioner an opinion that "unambiguously" concluded that it was more likely than not that petitioner's position would be upheld in litigation. Section 1.6661-5(d)(2), Income Tax Regs.
The relevant case law indicates that a taxpayer must have a profit motive and that there must be an objective possibility of making a profit without regard to tax benefits to avoid a finding that the transaction lacked economic substance. E.g., Frank Lyon Co. v. United States,435 U.S. 561 (1978); Friendship Dairies Inc. v. Commissioner,90 T.C. 1054 (1988). We have found that petitioner could not have concluded on the information available to him when he decided to invest that a reasonable possibility of economic profit existed. Petitioner could not have reasonably believed that the tax treatment he claimed was more likely than not correct, and petitioners are, therefore, liable for the section 6661 addition to tax. Decision will be entered under Rule 155.
Footnotes
1. All section references are to the Internal Revenue Code of 1954 as in effect for the years in issue. ↩
*. 50 percent of the interest due on the deficiency. ↩
2. Because of our decision on this issue, we do not reach other issues raised by the parties. ↩
3. The transaction appears to have been a wash with neither party actually incurring any significant expense or obligation. Because of the offsetting rent and installment obligations under the Bank Lease and the purchase agreement between CNA and CAG, and because neither that purchase agreement nor the User Lease are in evidence, we would presume that such evidence would be unfavorable to petitioners if produced. Wichita Terminal Elevator Co. v. Commissioner,6 T.C. 1158 (1946), affd. 162 F.2d 513↩ (10th Cir. 1947). Because of our disposition of this case on the lack of potential profitability, however, we have not disregarded the terms of the transaction. 4. Schedule B to the Purchase Agreement sets forth the "Basic Additional Consideration" as follows: During months 1-54 after Buyer's purchase of the Equipment, the Basic Additional Consideration shall equal twenty (20%) percent of Buyer's purchase price for the Equipment. Thereafter, the Basic Additional Consideration shall be the greater of: (i) twenty (20%) percent of the purchase price of the Equipment reduced by (a) an amount which is the product of (x) twenty (20%) percent of the purchase price of the Equipment and (y) a fraction, the numerator of which is the number of months elapsed from month 54 and the denominator of which is 96, and (b) the aggregate amount of any additional rent paid or then due to the Buyer pursuant to any Addendum to the Master Lease, or, (ii) the present discounted value of any additional rent which would become due to Buyer on account of any sublease of the Equipment then in effect. In this regard, the present discounted value shall be calculated at the highest discount rate then in effect of Citicorp or any of its subsidiaries or affiliates applied in the normal course of its business in discounting equipment leases, provided, however, in no event shall the discount rate exceed fifteen (15%) percent. ↩
5. Even if the buyer chose not to remedy the default, SLI's obligation to make the payments would be discharged. See infra.↩
6. Schedule B to the Master Lease provides the following formula for calculating the applicable termination charge: The Basic Termination charge in respect of a termination shall be an amount equal to the then present value of the aggregate rental payments remaining due to CAG for the initial term of the User Lease (without regard to any early termination, renewal or extension thereof) or any subsequent sublease of the Equipment by CAG, discounted at the rate of 12-1/2 % per annum. ↩
7. See note 3, supra.↩
8. The Basic Additional Consideration was to be calculated in the same manner as under the Master Lease. See note 5, supra.↩
9. Pursuant to the Purchase Agreement and Master Lease between CNA and SLI, CNA agreed to make rental payments directly to the new owner of the Equipment if SLI elected to sell it. The rental payments thus did not run through SLI. ↩
10. The appraisal as originally prepared stated that the rental payments under the User Lease were $ 105,138 per quarter. The numbers would not make sense if payments were in fact quarterly and the parties agree that this was a typographical error. On the copy presented to the Court, "quarter" is crossed out and "month" written in longhand above it. Piscitell was not sure whether he or someone in his office made the change or when the error was noticed. ↩
11. On brief petitioners rely on a projection showing expected cash flow over the term of the investment to establish that the investment had economic substance. The projection was offered but was not received into evidence because material portions of the original were missing from the copy offered. We did not consider it in our analysis. ↩
12. Compare Bussing v. Commissioner,88 T.C. 449, 454↩ (1987), in which the taxpayer/investor obtained and reviewed reports on third-party leasing of IBM computer equipment prior to investing. 13. The parties settled other issues relating to petitioner's investment in government securities and stipulated that petitioners are not liable for additions to tax under section 6653(a)(2)↩ relating to that transaction. 14. Section 6661 was added to the Code by the Tax Equity and Fiscal Responsibility Act of 1982, Pub. L. 97-248, section 323(a), 96 Stat. 613-614 and made applicable to returns the due date of which was after December 31, 1982. In 1983, section 6661(a) provided for an addition to tax equal to 10 percent of an underpayment of tax attributable to a substantial underpayment of income tax. The rate was subsequently increased to 25 percent and made applicable to penalties assessed after October 21, 1986. Pallottini v. Commissioner,90 T.C. 498↩ (1988).