IRVIN J. BUSSING AND ELIZABETH B. BUSSING, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 42550-84.        Filed February 23, 1987.

*Richard L. Gold* and *Robert Sylvor*, for the petitioners.
*Roland Barral* and *Jill A. Frisch*, for the respondent.

WILLIAMS, *Judge*: The Commissioner determined deficiencies in petitioners' Federal income tax and additions to tax as follows:

| Taxable year | Deficiency | Sec. 6653(a) [1] addition to tax |
|---|---|---|
| 1979 | $19,933 | $997 |
| 1980 | 17,316 | 866 |
| 1981 | 9,848 | 492 |

The issue this Court must decide is whether petitioners are entitled to deductions for depreciation and interest claimed with respect to petitioner Irvin Bussing's interest in certain computer equipment.

## FINDINGS OF FACT

Some of the facts have been stipulated and are so found. Irvin Bussing (hereinafter, Bussing) and Elizabeth Bussing were husband and wife who resided at San Francisco, California, at the time their petition in this case was filed.

The principal individual participants in the transaction at issue are Bussing, Carl Freyer, John Jelilian, and Daniel Perelson. Freyer was a director and officer of Computer Investors Group, Inc. (CIG), a computer leasing company, until 1975. In 1975, Freyer formed a small investment banking firm, Freyer Corp., through which he solicited the participation of Bussing in the transaction at issue. Jelilian was an officer of CIG, having been hired by Freyer, and served as the manager and director of CIG's European operations from 1978 through June of 1980. At the time of trial, Jelilian was a vice president of one of Freyer's investment banking firms. In 1979, Perelson was the president of Sutton Capital Corp. (Sutton), a Delaware corporation sometimes involved in CIG's computer leasing transactions.

The corporate participants in Bussing's lease were CIG, CIG Computers, AG, a wholly owned Swiss subsidiary of CIG (hereinafter AG), and Sutton. The computer equipment that is the subject of Bussing's lease is an IBM 3031 Processor Complex (the equipment), that had been purchased from IBM in Italy by an Italian company and

---

[1] All section references are to the Internal Revenue Code of 1954 as amended and in effect during the years in issue, unless otherwise indicated.

installed at that company's offices in Milan, Italy.[2] In 1979, the equipment was installed in the Zurich, Switzerland, offices of Continentale Allgemeine Versicherungs-AG (Continentale), a Swiss corporation.

On October 1, 1979, AG purchased the equipment from Continentale. The equipment was in place and operating in Continentale's offices in Zurich, Switzerland, at the time AG purchased it. The purchase price of the equipment was 1,900,000 Swiss Francs, the equivalent on October 1, 1979, of U.S. $1,227,400.[3] AG financed the purchase with a 5-year term loan of 1,900,000 Swiss Francs from Handelsbank N.W., secured by the equipment and by rentals from the lease between AG and Continentale. The note bore interest at an annual rate of 4.875 percent and called for monthly payments of approximately 38,000 Swiss Francs. The record does not indicate whether the loan was a recourse obligation.

Prior to its sale of the equipment to AG, Continentale as lessee and AG as lessor executed a lease agreement covering the equipment. Continentale was thereby assured that it would not lose the use of the equipment already installed and operating in its offices upon the sale of equipment to AG. The 60-month lease, executed September 11, 1979, called for rental payments of 39,400 Swiss Francs per month. The lease term commenced on October 1, 1979. Pursuant to the lease between AG and Continentale, Continentale was responsible for all taxes, and for installation, maintenance, repair, and insurance costs. Renegotiation for a renewal of the lease would commence 4 months prior to the end of the original lease term. AG's purchase of the equipment from Continentale and its leaseback to Continentale was an arm's-length transaction that reflected competitive rates and terms in the European market. Sutton purportedly acquired the equipment from AG sometime prior to December 7, 1979. The record does not reflect the terms or manner by which Sutton was to have acquired

[2]The record does not disclose the name of this company; however, it is identified as the parent company of Continentale Allgemeine Versicherungs-AG, a Swiss corporation.

[3]The parties have stipulated that the currency exchange rate was U.S. $0.6460 to the Swiss Franc on Oct. 1, 1979. Therefore, the purchase price of the equipment was .6460 × 1,900,000 = U.S. $1,227,400. The parties have also stipulated that the currency exchange rate was U.S. $0.6186 to the Swiss Franc on Dec. 7, 1979. Therefore, the purchase price of the equipment was equal to U.S. $1,175,340 on Dec. 7, 1979.

the equipment or the date of acquisition. Sutton purportedly sold a 22.2 percent undivided interest in the equipment to Bussing by purchase agreement dated December 7, 1979. The remaining interests in the equipment were sold separately to four other investors, including petitioners' son, John Bussing. Bussing's interest in the equipment is encumbered by the lease from AG to Continentale and the security interest held by Handelsbank N.W.

The purchase price of Bussing's interest in the equipment was $244,444. Bussing paid $10,000 in cash and $31,556 in the form of short-term promissory notes. These notes were paid in June 1980 and January 1981. Bussing financed the balance of the purchase price by a long-term promissory note to Sutton in the principal amount of $202,888, dated December 7, 1979. Sutton executed a bill of sale conveying "as is" a 22.2 percent interest in the equipment to Bussing, dated December 7, 1979. Bussing is personally liable with respect to $90,000 of the principal amount of his note to Sutton.[4] The note calls for seven annual payments in the amount of $41,674.31 each, commencing December 31, 1982. Payments of interest only were due in the amounts of $21,512 and $20,289 on December 31, 1980, and December 31, 1981, respectively. The note was secured by the equipment pursuant to a security agreement dated December 7, 1979.

The security agreement between Bussing and Sutton is subordinate to the security interest held by Handelsbank N.W. Pursuant to the terms of the security agreement, no additional interest accrues on the note upon the lessee's default in payment of rent to Bussing. Further, payment of the principal remaining under the note, plus interest accrued to the time of the default, would be deferred until December 31, 1991. Nevertheless, if Bussing were to receive any proceeds from the equipment following a default, the proceeds are to be paid to Sutton as prepayments of principal and interest, to be applied first against that portion of the note for which Bussing is personally liable.

---

[4] The note executed by Bussing states that he is personally liable for $120,000. However, the parties agree Bussing and Sutton understood that Bussing would be personally liable for only $90,000.

Bussing leased the equipment to AG by agreement dated December 7, 1979. The lease term commenced December 7, 1979, and terminates December 31, 1988; rent is payable in arrears on December 31 of each year of the lease. For the period December 7, 1979, to December 31, 1980, rent was $21,679. For the period January 1, 1981, to December 31, 1981, rent was $20,289. The rental amount for each year thereafter is $42,207. Bussing is entitled to "additional rent" equal to 22.2 percent of 33 percent of any net sublease rents received by AG, during the last 3 years of the lease.[5]

Bussing's lease with AG is a net-net-net lease, pursuant to which AG is responsible for all taxes, insurance, installation, maintenance, transportation, and other costs. AG bears the risk of loss of the equipment. Upon termination of the lease, AG bears the cost of transferring the equipment to a location in Europe designated by Bussing.

The lease provides that AG may substitute at any time equipment of equal or greater fair market value, qualifying as "like kind" property within the meaning of section 1031, having a useful life equal to that of the equipment within the meaning of section 1.167(a)-11, Income Tax Regs., and being subject to a lease to one or more third parties having credit standing reasonably acceptable to Bussing. The substitution would be subject to Bussing's reasonable approval of value and type of equipment.

Bussing is entitled to rent from Continentale in the event AG defaults on its rental obligations. AG's lease obligations to petitioner are, however, guaranteed by CIG by agreement dated December 7, 1979.

AG's monthly payments on its note to Handelsbank N.W. were financed by its monthly rent from Continentale. The record does not disclose AG's cash-flow from the purchase and lease transaction with Continentale nor does it indicate whether Continentale's rent payments were made directly to Handelsbank N.W.

Bussing's annual payments on his obligation to Sutton were financed by his annual rent from AG. Bussing's net

---

[5]The net rents received by AG from subleasing the equipment are the gross rents less AG's marketing expenses. Such expenses, however, are not to exceed 12 percent of the gross rents received by AG.

cash-flow from the purchase and lease agreements executed by Bussing, AG, and Sutton was zero during the first 3 years of the lease term and was supposed to be $533 per year for the remainder of the lease term. Subsequent to the commencement of the lease, however, Bussing neither made nor received any payments with respect to the transaction.

Bussing also executed a marketing agreement with AG. Pursuant to the agreement, AG is appointed as Bussing's exclusive marketing agent of his interest in the equipment and makes any day-to-day marketing decisions. AG is obligated to market the equipment at its then fair market value. Bussing, in turn, is obligated to execute all documents necessary to such marketing. AG is entitled to 15 percent of the proceeds received from any sale or lease of the equipment in addition to reimbursement of any marketing costs which are limited to 12 percent of the gross proceeds. AG warranted that all other owners of percentage interests in the equipment executed similar agreements.

IBM reduced its list prices on the Swiss market for its equipment in November of 1979 by approximately 7 percent. The purchase price for the equipment, by extrapolating Bussing's price of $244,444 for a 22.2-percent interest in the machine, would be $1,101,099.10 as of October 1, 1979. Respondent's expert, Frederick Withington, opined that as of December 7, 1979, this price reflected a fair market value.

Prior to entering the transaction at issue, Bussing received a report prepared by International Data Corp. dated December of 1978 on the domestic market for the purchase and third-party leasing of IBM computer equipment, including the IBM 3031 Processor Complex. The report projected a residual value in the United States of 13 percent of the original market price at the end of 1987. Bussing also received a financial spread sheet prepared by CIG which projected a net after-tax annual return of 7 percent on Bussing's investment through 1988. The spread sheet anticipated a residual value of 20 percent of the original market price at the end of 1988. The spread sheet did not take into account the fees and costs provided in the marketing agreement between AG and Bussing in calculat-

ing the return to Bussing of the residual value of the equipment.

Petitioners reported income and expenses and claimed losses from Bussing's participation in the transaction at issue on their joint Federal income tax returns for the taxable years ended December 31, 1979, 1980, and 1981 as follows:

|                     | 1979       | 1980      | 1981      |
|---------------------|------------|-----------|-----------|
| Rents received      | 0          | $21,512   | $20,289   |
| Other income        | 0          | 0         | 1,223     |
| Depreciation expense| ($34,053)  | (52,598)  | (39,448)  |
| Interest expense    | 0          | (21,512)  | (22,355)  |
| Net gain (loss)     | (34,053)   | (52,598)  | (40,291)  |

Respondent disallowed the losses claimed by petitioners with respect to the transaction at issue for each of the years 1979, 1980, and 1981.

OPINION

Respondent argues that the transaction entered into by Bussing lacks economic substance. Respondent contends that Bussing acquired no interest in the equipment, but instead merely provided capital to AG through Sutton in exchange for certain tax benefits. On this basis, argues respondent, petitioners are not entitled to the deductions for depreciation and interest expenses claimed on their returns for the years 1979, 1980, and 1981. Respondent offers two further alternative arguments: (1) That the transaction at issue in this case was not an activity entered into for profit within the meaning of section 183 and (2) that petitioner is not at risk within the meaning of section 465 with respect to a significant portion of the basis in the equipment.[6]

Petitioners respond that the purchase and lease transactions were legitimate, arm's-length transactions involving

---

[6]Respondent raises a third argument for the first time on brief, namely that with respect to the transaction at issue petitioners' taxable year did not commence until Dec. 8, 1979, for purposes of applying the half-year convention pursuant to sec. 1.167(a)-11(c)(2)(iii), Income Tax Regs. Respondent did not raise this issue at any time prior to briefing. This issue represents the introduction of a new matter, which would require presentation of different evidence. *Achiro v. Commissioner*, 77 T.C. 881, 890 (1981). Since this issue was raised after the record was closed, justice requires that we not consider this argument. Cf. *United States v. First Security Bank*, 334 F.2d 120 (9th Cir. 1964); *Commissioner v. Chelsea Products, Inc.*, 197 F.2d 620 (3d Cir. 1952).

competitive prices, rates, and terms. Petitioners argue therefore, that they are entitled to the loss deductions claimed.

It is well settled that the substance of a transaction, and not its form, determines its tax consequences. *Gregory v. Helvering*, 293 U.S. 465 (1935). A transaction must be compelled or encouraged by business or regulatory realities and by non-tax business reasons. It must not be motivated solely by tax-avoidance considerations. *Frank Lyon Co. v. United States*, 435 U.S. 561 (1978); *Knetsch v. United States*, 364 U.S. 361 (1960). However, the tax laws affect the shape of every business transaction. The parties to a transaction are entitled to take into account and to maximize favorable tax results so long as the transaction is compelled or encouraged by non-tax business reasons. *James v. Commissioner*, 87 T.C. 905, 918 (1986); see *Frank Lyon Co. v. United States*, *supra*.

In this case, AG purchased from and leased to Continentale an IBM 3031 Processor Complex that was in place and being used by Continentale at the time of the sale-leaseback. A diagram of this transaction is as follows:

AG purchased the unencumbered equipment in place at Continentale's offices in Zurich, Switzerland, and financed the purchase in its entirety by the loan from Handelsbank N.W., an independent third-party lender. The equipment, leased back to Continental pursuant to a net-net-net lease,

remained in place. The sale-leaseback between AG and Continentale represents an arm's-length transaction between independent parties reflecting competitive rates and terms. See *Frank Lyon Co. v. United States, supra.* Respondent does not dispute the reality of this transaction between Continentale and AG.

Respondent challenges the reality of the transactions among AG, Sutton, Bussing, and CIG for the sale and leaseback of the equipment. We agree with respondent that the form of the sale-leaseback between Bussing, AG, and Sutton does not conform to its substance. We disagree, however, with respondent's position that Bussing acquired only tax benefits. The transaction challenged by respondent involves the purported sale of the equipment by AG to Sutton to Bussing and the lease of the equipment by Bussing to AG.

The record is barren of any evidence of the date, form, or terms of the purported conveyance of the equipment from AG to Sutton. Perelson, Sutton's president and the participant in the transaction on behalf of Sutton, had no recollection of the transaction other than that CIG had solicited Sutton's participation. Perelson's knowledge of the possible business reasons for the form of the transaction extended only to Sutton's obvious desire to make an undisclosed profit. Perelson had no knowledge of possible effects of the transaction on Sutton's own interests. Perelson believed Sutton's role was solely that of a middleman to "make the transaction qualify for Federal income tax purposes." Bussing himself believed that he purchased the equipment from AG, and not from Sutton. Sutton's ownership of the equipment and participation in the transaction with Bussing are clouded at best. We believe that Sutton was inserted in the transaction by CIG to facilitate the appearance of satisfying the "at risk" provision of section 465 and to make the transaction appear to be a genuine multiple-party transaction for purposes of applying *Frank Lyon Co. v. United States,* 435 U.S. 561 (1978). Therefore, in examining the substance of the leasing transaction between Bussing and AG, we believe the participation of Sutton must be disregarded.

Further, we conclude that Bussing's obligation in the principal amount of $202,888 does not represent valid indebtedness, and must be disregarded as well.[7] The transaction at issue is not a genuine multiple-party transaction, but a purported sale-leaseback pursuant to which the respective lease and debt obligations flow between only two parties. Compare *Frank Lyon Co. v. United States*, 435 U.S. 561 (1978). After closing, Sutton disappeared entirely from the transaction. Although Bussing was supposed to earn a net cash-flow of $533 per year pursuant to the purchase and lease agreements involved,[8] neither party made or received any payments with respect to the transaction subsequent to the cash downpayment by Bussing. The respective obligations between AG and Bussing cancel each other out. Any possible claim by AG with respect to the note is fully offset by AG's rental obligation to Bussing. Further, AG's rent is guaranteed by CIG, and in the event of a default by AG, Bussing's principal obligation under his note is deferred until 1991. Bussing, effectively, will never be required to make any payments on his debt obligation, a feature of the transaction that we believe the parties intended to achieve. Therefore, for Federal income tax purposes we disregard Bussing's obligation in the principal amount of $202,888.

The transaction thus viewed cannot be a sale of a 22.2 percent ownership interest in the equipment by AG to Bussing and a lease of that interest by Bussing back to AG. Bussing's interest in the transaction was acquired by his cash investment of $41,556. At issue is the character of this transaction and the nature of the actual interest in the equipment that Bussing acquired from AG, if any.

We are satisfied, first, that Bussing acquired more than mere tax benefits. The documents in the record reflect that Bussing actually acquired an interest in the equipment. Although the note executed by Bussing to finance, in part, his acquisition of an interest in the equipment does not reflect valid indebtedness, we believe that his cash payment evidences the purchase of an economic, depreciable interest

---

[7]Sutton's participation in the transaction served no valid business purpose and is disregarded. Therefore, we find that the real lender with respect to Bussing's obligation in the principal amount of $202,888 was AG, not Sutton.

[8]Representing the amount by which AG's rent under its lease with Bussing exceeded Bussing's obligation under his note.

in the equipment. There was an objective possibility that the transaction would be profitable to Bussing before tax benefits were taken into account. *Gefen v. Commissioner*, 87 T.C. 1471 (1986); *James v. Commissioner, supra.*

Bussing paid $41,556 in cash and short-term promissory notes, excluding interest, for the equipment. A positive cash-flow could be reasonably expected from the following sources: "additional rent" earned pursuant to his arrangement with AG and residual value from remarketing the equipment. At the time he entered the transaction in 1979, Bussing could reasonably have expected cash-flow over the term of the transaction as follows:

YEAR

|  | 1979 | 1980 | 1981 | 1982 | 1983 | 1984 | 1985 | 1986 | 1987 | 1988 |
|---|---|---|---|---|---|---|---|---|---|---|
| Equity | ($10,000) | ($18,256) | ($13,300) | | | | | | | |
| "Additional rent" | | | | | | | | $6,400 | $4,600 | $3,700 |
| Residual value (20%) | | | | | | | | | | 48,900 |
| Net cash-flow | (10,000) | (18,256) | (13,300) | | | | | 6,400 | 4,600 | 52,600 |

Based on these figures, petitioner would receive a net positive cash-flow of $22,044.[9]

CIG's figure for residual value, however, fails to reflect the fees due AG pursuant to its marketing agreement with Bussing. These fees may represent up to 25 percent of the gross proceeds generated from any marketing of the equipment by AG following the termination of its lease with Bussing. AG is Bussing's exclusive agent for marketing the equipment. In accordance with the marketing agreement, therefore, the projected proceeds derived from the anticipated residual value of the equipment must be reduced by 25 percent, from $48,900 to $36,675. However, despite this reduction, the transaction would still be reasonably expected to generate a net positive cash-flow to petitioner of

---

[9]The IDC report projected a residual value in the United States of 13 percent at the end of 1987. Based on the expert testimony before us, we find that the European market may lag as much as 1 year behind that of the United States. Therefore, it is reasonable to extend the values projected by the IDC report 1 year to determine projected residual values in the European market.

CIG projected that the residual value of the equipment would be 20 percent at the end of 1988. Although more optimistic than the residual value of 13 percent projected in the report by IDC, reliance on CIG's projections is reasonable in light of the margins for error projected by the IDC report and the testimony of witnesses involved in the computer purchasing and leasing industry as to the nature and potential of the computer leasing market in Europe for the IBM 3031 Processor Complex as perceived in 1979.

$9,819. We conclude that Bussing acquired an economic interest in the equipment.[10]

Bussing acquired his interest in the equipment purportedly as co-tenant of an undivided percentage interest in the equipment with the four other investors in the transaction. We believe, however, that the substance of the transaction for Federal income tax purposes is that Bussing acquired his interest in a joint venture with AG and the other investors. *Leahy v. Commissioner*, 87 T.C. 56 (1986).

Section 761(a) defines a "partnership" broadly to include "a syndicate, group, pool, joint venture or other unincorporated organization through or by means of which any business, financial operation, or venture is carried on, and which is not, within the meaning of this title [subtitle], a corporation or a trust or estate." The meaning of the term for Federal tax purposes is broader in scope than the meaning of the term at common law. Sec. 1.761-1(a), Income Tax Regs.; *McManus v. Commissioner*, 583 F.2d 443 (9th Cir. 1978), cert. denied 440 U.S. 959 (1979). A partnership for Federal income tax purposes is formed when the parties to a venture join together capital or services with the intent of conducting a business or enterprise and of sharing the profits and/or losses of the venture. *Commissioner v. Tower*, 327 U.S. 280 (1946); *Commissioner v. Culbertson*, 337 U.S. 733 (1949); see also *Smith's Estate v. Commissioner*, 313 F.2d 724 (8th Cir. 1963); 1 W. McKee, W. Nelson & R. Whitmire, Federal Taxation of Partnerships and Partners, par. 3.02 (1977).

In this case Bussing acquired an interest in the equipment encumbered by a security interest held by

---

[10]Respondent argues in the alternative that the transaction at issue was not an activity engaged in for profit within the meaning of sec. 183, which provides in part:

SEC. 183(a). GENERAL RULE.—In the case of an activity engaged in by an individual or an S corporation, *if such activity is not engaged in for profit*, no deduction attributable to such activity shall be allowed under this chapter except as provided in this section.

An activity engaged in for profit within the meaning of sec. 183 is one with respect to which deductions are allowable pursuant to sec. 162 as a trade or business or to sec. 212(1) and (2) as an activity engaged in for the collection or production of income. Sec. 183(b). All relevant facts and circumstances must be considered. Sec. 1.183-2(b), Income Tax Regs.

In this case Bussing entered into an arm's-length transaction with economic substance in which he had a reasonable prospect of achieving a profit. The economic interest in the equipment acquired by Bussing represents property held for the production or collection of income within the meaning of sec. 212. Therefore, the transaction at issue is an activity engaged in for profit within the meaning of sec. 183.

Handelsbank N.W. and by a lease from AG to Continentale. AG remained liable on its obligation to Handelsbank N.W. after Bussing acquired his interest in the equipment. Bussing did not assume liability for AG's obligation to Handelsbank N.W., and had no personal liability on AG's obligation to Handelsbank or with respect to AG's sale and leaseback transaction with Continentale in general. Bussing's interest in the equipment was not protected from foreclosure in the event AG defaulted on its obligation to Handelsbank N.W., since petitioner was afforded no remedy if Handelsbank foreclosed on its security interest in the equipment pursuant to its rights under its security agreement with AG.

Bussing's interest in the transaction was approximately 7 percent of "additional rent" and 22.2 percent of net residual value in the equipment.[11] AG's interest in the equipment was similar to Bussing's. Pursuant to the terms of its marketing agreement with Bussing, AG has an interest in 15 percent of the net proceeds generated from the marketing of the equipment—i.e., the net residual value of the equipment.[12] Pursuant to the agreements between AG and Bussing, AG is also entitled to 67 percent of the "additional rent," i.e., rents received from subleasing the equipment during the final 3 years of the "lease" term, net of any marketing costs. The net percentage interest retained by AG (15 percent of net residual value or 13.2 percent of gross residual value) is as substantial as the percentage interest acquired by Bussing (22.2 percent of net residual value or 16.6 percent of gross residual value). The substance of the interest retained by AG and of that acquired by Bussing is the same.

The several agreements executed by and between Bussing and AG, viewed as a whole, evidence an intent to join

---

[11]Bussing's percentage interests in the equipment are calculated as follows: Bussing is entitled to 22.2 percent of 33 percent of the "additional rent" from the equipment. Bussing's percentage interest in "additional rent" is thus 22.2% × 33.0% = 7.3%. The residual value is net of marketing costs and expenses incurred by AG, which are not to exceed 12 percent, and AG's percentage interest in residual value of 13.2 percent (see note 12, below). Bussing's interest represents 22.2 percent of net residual value which is 16.6 percent of gross residual value (22.2% × (88% - 13.2%) = 16.6%).

[12]AG's percentage interest in residual value is calculated as follows: the interest is net of marketing costs and expenses incurred by AG which are not to exceed 12 percent. AG's interest represents 15 percent of the net residual value of the equipment (i.e., 88 percent of gross residual value) or 13.2 percent of gross residual value (15% × 88% = 13.2%).

together in a transaction in order to share profits and losses. First, each party has contributed something of value to the venture—petitioner, his capital; AG, its services, business contacts, and the equipment subject to encumbrances. Second, each party has a significant interest in the rental and the residual value of the equipment. AG's loan to Handelsbank is paid down by Continentale's rent. AG's "rent" to Bussing equals Bussing's "loan" payments to AG. No losses are allocated to AG, but instead are allocated to Bussing and the other investors in accordance with the interest acquired by each. The substance of this transaction is that the parties are engaged in a joint venture—to invest in, lease, and market the equipment. *Leahy v. Commissioner*, 87 T.C. 56, 71 (1986). Therefore, Bussing, the other investors, and AG are in partnership for purposes of Federal income taxation.

The initial adjusted basis of a partner's interest in a partnership is determined pursuant to the provisions of section 722, which provides:

> The basis of an interest in a partnership acquired by a contribution of property, including money, to the partnership shall be the amount of such money and the adjusted basis of such property to the contributing partner at the time of the contribution increased by the amount (if any) of gain recognized under section 721(b) to the contributing partner at such time.

Bussing may deduct his distributive share of the losses of the partnership only to the extent to which his partnership basis is at risk within the meaning of section 465.[13] See sec. 704(d).

---

[13]Sec. 465 provides in relevant part:

SEC. 465(a). LIMITATION TO AMOUNT AT RISK.—

  (1) IN GENERAL.—In the case of—

    (A) an individual, * * *

engaged in an activity to which this section applies, any loss from such activity for the taxable year shall be allowed only to the extent of the aggregate amount with respect to which the taxpayer is at risk (within the meaning of subsection (b)) for such activity at the close of the taxable year.

        *      *      *      *      *      *      *

(b) AMOUNTS CONSIDERED AT RISK.—

  (1) IN GENERAL.—For purposes of this section, a taxpayer shall be considered at risk for an activity with respect to amounts including—

    (A) the amount of money and the adjusted basis of other property contributed by the taxpayer to the activity, and

    (B) amounts borrowed with respect to such activity (as determined under paragraph (2)).

Bussing's note in the amount of $202,888 is not valid indebtedness, and therefore is not included in his basis in the partnership.[14] Bussing's basis in the partnership is therefore limited to the amount of his cash investment, $41,556, of which principal payments were made of $10,000 on December 7, 1979, $18,256 on June 26, 1980, and $13,300 on January 12, 1981.[15] Bussing is at risk for the full amount of the cash contributed to the activity. Sec. 465(b)(1)(A). It remains for us to determine, however, in what tax year or years petitioner acquired his at risk amount in the partnership.

A taxpayer has zero basis in an executed obligation as no cost is incurred in making the note. See *Alderman v. Commissioner*, 55 T.C. 662 (1971). For a cash-basis taxpayer, giving a note is not equivalent to giving cash. *Helvering v. Price*, 309 U.S. 409 (1940); *Menz v. Commissioner*, 80 T.C. 1174 (1983). Therefore, payments by a partner on his written obligation, representing the partner's contribution to the partnership, are added to the partner's

---

(2) BORROWED AMOUNTS.—For purposes of this section, a taxpayer shall be considered at risk with respect to amounts borrowed for use in an activity to the extent that he—

(A) is personally liable for the repayment of such amounts, or

(B) has pledged property, other than property used in such activity, as security for such borrowed amount (to the extent of the net fair market value of the taxpayer's interest in such property.)

No property shall be taken into account as security if such property is directly or indirectly financed by indebtedness which is secured by property described in paragraph (1).

(3) CERTAIN BORROWED AMOUNTS EXCLUDED.—

(A) IN GENERAL.—Except to the extent provided in regulations, for purposes of paragraph (1)(B), amounts borrowed shall not be considered to be at risk with respect to an activity if such amounts are borrowed from any person who has an interest in such activity or from a related person to a person (other than the taxpayer) having such an interest.

\*      \*      \*      \*      \*      \*      \*

(4) EXCEPTION.—Notwithstanding any other provision of this section, a taxpayer shall not be considered at risk with respect to amounts protected against loss through nonrecourse financing, guarantees, stop loss agreements, or other similar arrangements.

[14]Even if Bussing's debt obligation of $202,888 were valid indebtedness, we would still be compelled to conclude that Bussing is not at risk with respect to the amount represented by his note, since it represents an obligation to a party with an interest in the activity other than that as creditor—AG. Sec. 465(b)(3)(A); see *Jackson v. Commissioner*, 86 T.C. 492, 529 (1986). AG has an interest, as the managing partner, in the income derived from subleasing the equipment and from the residual value of the equipment. AG's retained percentage interest in the transaction is as substantial as that of Bussing and the other investors. AG is thus a party with an interest in the activity other than that as creditor. Therefore, Bussing is not at risk with respect to his note to AG in the amount of $202,888 within the meaning of sec. 465.

[15]The payments made on June 26, 1980 and Jan. 12, 1981, also included payments of interest totaling $3,508.52, which were added to the payments of principal indicated.

basis in the partnership only as the payments are made.[16]

Bussing paid $10,000 to the partnership on December 7, 1979, and executed short-term notes for the remaining $31,556 of his cash investment. Bussing's basis in the notes was zero, and no payments were made on the notes in 1979. Therefore, Bussing's initial basis in the partnership was $10,000. Bussing's basis in the partnership for 1980 is adjusted by $18,256 to reflect payment to the partnership of that amount of June 26, 1980. Similarly, Bussing's basis in the partnership for 1981 is increased by $13,300 to reflect Bussing's payment to the partnership on January 12, 1981. Adjustments for any allocable share of income, loss, or deduction will be the subject of the proceedings under Rule 155, Tax Court Rules of Practice and Procedure.

In view of the foregoing,

*Decision will be entered pursuant to Rule 155.*

---

[16]See *Oden v. Commissioner*, T.C. Memo. 1981-184, affd. without published opinion 679 F.2d 885 (4th Cir. 1982).

