HGA CINEMA TRUST, BURTON W. KANTER, TRUSTEE, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
HGA Cinema Trust v. Commissioner
Docket Nos. 37830-85; 39610-85
United States Tax Court
T.C. Memo 1989-370; 1989 Tax Ct. Memo LEXIS 369; 57 T.C.M. (CCH) 1066; T.C.M. (RIA) 89370; July 25, 1989; As corrected July 24, 1989 Burton W. Kanter, Robert D. Zimelis, Earl N. Melamed, Seymour I. Sherman, and Harold J. Lipsitz, for the petitioner. Lawrence C. Letkewicz, and Joel D. Arnold, for the respondent. WILLIAMS
MEMORANDUM FINDINGS OF FACT AND OPINION WILLIAMS, Judge: The Commissioner determined deficiencies in petitioner's Federal income tax and additions to tax for the taxable years 1978, 1979, 1980 and 1981 as follows: Additions to Tax
Deficiency
§ 6651(a)(1) [1]
§ 6653(a)
§ 6659(a)
1978 [2]
$  3,936.43
--
--
--
1979
25,551.00
6,388.00
1,352.00
--
1980
31,345.00
--
1,567.00
--
1981
39,443.00
--
--
5,755.00
*371 The Commissioner also claimed an increase in interest pursuant to section 6621(c) for the taxable years at issue. The issues presented are: (1) whether certain long-term promissory notes of petitioner's partnership issued in connection with the purchase of computer equipment represent valid indebtedness; (2) whether the additions to tax pursuant to sections 6651(a)(1) and 6653(a) are warranted; and (3) whether the increase in the interest rate pursuant to section 6621(c) is appropriate. Based on the stipulations, respondent conceded the section 6659(a) addition to tax. This is a test case for a number of cases involving other limited partners in petitioner's partnership. FINDINGS OF FACT Some of the facts have been stipulated and are so found. Petitioner, HGA Cinema Trust, is a trust whose address is in Chicago, Illinois. Petitioner's trustee is Burton W. Kanter, a tax attorney. Petitioner timely filed U.S. Fiduciary Income Tax Returns (Forms 1041) for the taxable years 1978, 1980 and 1981. Petitioner filed its return for the taxable year 1979 on November 5, 1981. The principal corporate participants in the transactions at issue are O.P.M. Leasing Services, Inc. *372 ("O.P.M."), Funding Systems Leasing Corporation ("Funding"), Pluto Leasing Corporation ("Pluto"), and Knight Leasing Corporation ("Knight"). O.P.M. and Funding (the "Leasing Corporations") both were engaged in the equipment leasing business during the years at issue. Pluto and Knight (the "Intermediary Corporations") bought the Leasing Corporations' interest in the equipment and sold it to investors in the transactions at issue after leasing it back to the Leasing Corporations. SLG is a limited partnership formed under the laws of Connecticut. The general partner of SLG is The Holding Company, a corporation formed under the laws of Delaware, owned principally by various family trusts for the benefit of Burton W. Kanter's family members. Petitioner had a 5.56-percent interest in profits and losses as a limited partner of SLG during each of the taxable years 1978 through 1981. On June 30, 1978, Funding, Pluto and SLG entered into transactions for the sale and leaseback of certain used computer equipment. O.P.M., Knight and SLG also entered into transactions for the sale and leaseback of a percentage interest in certain other used computer equipment on June 30, 1978. Joel Mallin *373 was the promoter of these transactions. The Leasing Corporations purchased various computer equipment that was installed with end users by assuming the end users' purchase obligations with the equipment manufacturer or vendor. The Leasing Corporations leased the equipment back to the end users. To finance most of the purchase price, the Leasing Corporations obtained a nonrecourse loan from an institutional lender (the "Lender") secured by a first lien on the equipment and by an assignment of the user lease. At closing, the Lender advanced the present value of the future lease rentals. With these funds, the Leasing Corporations were able to pay a major portion of the total cost of the equipment to the manufacturer or vendor required by the assumed purchase obligation. The sale and leasebacks among the Leasing Corporations, the Lenders and the end users were valid multiparty transactions the form of which had substance. Funding, Pluto and SLG
Concurrently with or subsequent to closing with the Lender, but also on June 30, 1978, Funding agreed to sell the leased equipment to Pluto subject to the lien of the Lender and the lease rights of the end user. The purchase price in *374 the agreement between Funding and Pluto was $ 2,700,000, payable $ 5,000 in cash, $ 25,000 by negotiable promissory note due on July 31, 1978, without interest, and $ 2,670,000 by limited recourse promissory note. The limited recourse note was payable in 96 monthly installments with annual interest at the rate of 10.4 percent. The first 18 monthly payments were interest only, in the amount of $ 23,140 each. The remaining payments of principal and interest were $ 47,237.13 each. Pursuant to the terms of the long-term note, and in partial satisfaction of the interest due, Pluto executed and delivered to Funding a fully recourse non-interest-bearing promissory note in the principal amount of $ 70,000 due July 31, 1978. The $ 70,000 note represented $ 11,666.67 of each of the first six months' payments on the long-term note. Also, on June 30, 1978, pursuant to the terms of the long-term note, Pluto executed and delivered to Funding a promissory note in the principal amount of $ 89,000 bearing interest at the rate of eight percent due on March 31, 1979. The $ 89,000 note represented $ 7,416.67 of the next twelve months' payments on the long-term note. Pluto agreed to lease the *375 computer equipment back to Funding on June 30, 1978, for a term extending through June 30, 1986. The lease agreement provided for a net lease with rent payable as follows: $ 11,673.33 for each of the first six months of the lease term; $ 15,923.33 for each of the next 12 months of the lease term; and $ 47,437.13 for each of the remaining 78 months of the lease term. The lease agreement also provided that "Lessee [Funding] will indemnify Lessor and protect, defend and hold it harmless from and against any and all loss, cost, damage, injury or expense * * * which Lessor * * * may incur by reason of any breach by Lessee of any of the representations by, or obligations of, Lessee contained in this Lease * * *." Funding and Pluto also executed a remarketing agreement on June 30, 1978. Funding agreed to remarket the equipment after Pluto's lease to Funding terminated. Pluto agreed to pay Funding ten percent of all net proceeds from the remarketing. Also on June 30, 1978, Pluto and SLG entered into a Purchase Agreement with respect to the equipment Pluto had acquired from and leased back to Funding. Pluto assigned its rights and interests in the equipment and lease to SLG subject *376 to the prior liens of the Lenders, the rights of the end users and the rights of Funding pursuant to its agreements with Pluto. SLG assumed all of Pluto's obligations arising out of its purchase agreement, lease agreement and remarketing agreement with Funding. SLG did not assume Pluto's long-term note or short-term recourse notes. The purchase price in the agreement between Pluto and SLG was $ 2,705,000 payable $ 5,000 in cash, $ 25,000 by negotiable promissory note due on July 31, 1978, $ 5,000 by negotiable promissory note due on March 31, 1979, and $ 2,670,000 by long-term promissory note. The payment terms of SLG's long-term note to Pluto were identical to the payment terms of the long-term limited recourse note Pluto gave Funding. SLG also executed and delivered to Pluto notes for prepaid interest in the principal amounts of $ 70,000 and $ 89,000, identical (but for the parties) to the notes Pluto gave Funding. The evidence shows that SLG paid these short-term notes but does not indicate when SLG paid them. The parties stipulated that SLG is entitled to deduct the interest it paid on the $ 89,000 promissory note. After reduction for the interest prepayments, the required *377 monthly payments pursuant to SLG's long-term note to Pluto were $ 11,473.33 for the first six months, $ 15,723.13 for the next twelve months and $ 47,237.13 for the remaining 78 months. The difference between the rent due on the lease between Funding and Pluto that SLG acquired and the amounts of monthly payments SLG was obligated to pay on the long-term note to Pluto was $ 200 per month. Two hundred dollars is the monthly cash flow SLG anticipated the transaction would generate. The long-term note contained the following provisions: 5.2 Deferral. In the event the Lease is terminated prior to the expiration of the Lease term, on account of an Event of Default as defined thereunder, then, notwithstanding anything herein to the contrary, the entire unpaid principal amount of this Note, together with all interest accruing hereunder shall be deferred and shall not be due and payable until June 30, 1993, at which time all such unpaid principal and accrued interest shall become due and payable; provided, however, that notwithstanding such deferral to the extent Payor shall receive any proceeds from the Equipment following a termination of the Lease as aforesaid, it shall be obligated *378 to pay such proceeds to the Senior Lienholder on account of the Debts (and such payment shall be deemed to be prepayments under this Note). 5.3 Extension, Set-Off and Discharge. Debtor shall have, in addition to all other rights and remedies it may have, the right to defer payment of (but not reduce the amount of) each and every payment of principal and interest as the same becomes due hereunder if and to the extent any amount of rent or other sum becoming due to Debtor under the Lease is not paid by Funding as the same becomes due (the "Past Due Sum"). The amount of principal and interest so deferred will become due and payable at such time as, and to the extent that, Funding pays to Debtor such Past Due Sum; provided, however, that no interest shall accrue on the principal and interest payments so deferred. Any Past Due Sum remaining due to Debtor at the expiration or sooner termination of the Lease will serve to reduce the unpaid principal and interest on this Note at that time. O.P.M., Knight and SLG
On June 30, 1978, O.P.M., Knight and SLG entered into a transaction, not materially different from the Funding-Pluto-SLG transaction, for the sale and leaseback of *379 a 45-percent interest in certain used computer equipment. The format of these transactions was the same as the Funding-Pluto-SLG transaction; Knight conveyed to SLG a 45 percent interest in the equipment that was the subject of the sale and leaseback between O.P.M. and Knight. O.P.M. entered into an agreement to sell certain computer equipment to Knight, subject to the lien of the Lender and the rights of the user. The purchase price was $ 5,005,655, payable $ 25,000 in cash, $ 25,000 by negotiable promissory note due July 31, 1978, without interest, and $ 4,955,655 by limited recourse promissory note. The limited recourse note was payable in 96 monthly payments with interest at the rate of 10.2 percent. The first 18 monthly payments on the long-term note consisted exclusively of interest in the amount of $ 42,123 each. The payment on the long-term note for each of the remaining months was $ 87,166.01. Pursuant to the terms of the long-term note, however, Knight executed and delivered to O.P.M. a non-interest-bearing promissory note in the principal amount of $ 125,000, due July 31, 1978, that represents $ 20,833.33 of each of the first six months' payments on the long-term *380 note. Also, on June 30, 1978, pursuant to the long-term note, Knight executed and delivered to O.P.M. a promissory note in the principal amount of $ 138,000, bearing interest at the rate of eight percent and due March 31, 1979. The $ 138,000 note represents $ 11,500 of each of the next twelve months' payments on the long-term note. Knight leased the equipment back to O.P.M. on June 30, 1978, for a term extending through June 30, 1986. O.P.M. agreed to pay the following rent: $ 21,644.67 for each of the first six months of the lease; $ 30,978 for each of the next twelve months; and $ 87,521.01 for each of the remaining 78 months of the lease. The lease agreement provided that "Lessee [O.P.M.] will indemnify Lessor and protect, defend and hold it harmless from and against any and all loss, cost, damage, injury or expense * * * which Lessor * * * may incur by reason of any breach by Lessee of any of the representations by, or obligations of, Lessee contained in this Lease * * *." Knight and O.P.M. also entered into a remarketing agreement for the period following the expiration of the lease. Pursuant to the remarketing agreement, Knight agreed to pay O.P.M. ten percent of all net *381 proceeds O.P.M. derived from the remarketing. Knight and SLG entered into a Purchase Agreement on June 30, 1978. SLG agreed to purchase from Knight a 45 percent interest in the equipment Knight had acquired from O.P.M. Knight assigned all of its rights and interests in the equipment and lease to SLG subject to the prior lien of the Lenders, the rights of the end users and the rights of O.P.M. pursuant to its agreements with Knight. SLG assumed all of Knight's obligations arising out of its purchase agreement, lease agreement and remarketing agreement with O.P.M. SLG did not assume Knight's debt obligations to O.P.M. The purchase price was $ 2,257,045, payable $ 11,250 in cash, $ 11,250 by negotiable promissory note due July 31, 1978, without interest, $ 4,500 by negotiable promissory note due March 31, 1979, without interest, and $ 2,230,045 by long-term promissory note. The $ 11,250 cash payment and the $ 11,250 note are 45 percent of the $ 25,000 cash payment and $ 25,000 note from Knight to O.P.M. The long-term note was payable in 96 consecutive monthly payments with interest at the rate of 10.2 percent per annum. The payment terms on SLG's long-term note to Knight were *382 exactly 45 percent of the corresponding terms of Knight's long-term note to O.P.M. The first 18 payments consisted exclusively of interest in the amount of $ 18,955.33 each. The remaining payment of principal and interest was $ 39,224.71 each. On June 30, 1978, in partial satisfaction of the long-term note, SLG also executed and delivered to Knight non-interest-bearing promissory notes in the amounts of $ 33,750 and $ 22,500 under which SLG became obligated for $ 9,375 of each of the first six months' payments. Pursuant to the terms of the long-term note, SLG also on June 30, 1978, executed and delivered to Knight a $ 62,100 promissory note bearing interest at the rate of eight percent and due March 31, 1979. The $ 62,100 note represents $ 5,175 of each of the next twelve months' payments on the long-term note. The evidence shows that SLG paid these short-term notes, but does not indicate when SLG paid them. The parties stipulated that SLG is entitled to deduct the interest it paid on the $ 62,100 promissory note. After reduction for the interest prepayments, SLG's required monthly payments to Knight pursuant to the long-term note were $ 9,580.33 for the first six months, *383 $ 13,780.33 for the next 12 months and $ 39,224.71 for the remaining 78 months. The difference between 45 percent of the rental payments in the lease between Knight and O.P.M., which Knight assigned to SLG, and the amounts SLG was required to pay Knight on the long-term note was $ 160 per month. SLG anticipated that the transaction with O.P.M. and Knight would generate this monthly cash flow. The long-term note contained provisions identical to SLG's note to Pluto for deferral, extension, set-off and discharge, supra, except for the parties (O.P.M. is substituted for Funding). SLG and Petitioner
As of June 30, 1978, SLG expected the equipment to have a residual value at the end of the leasebacks on June 30, 1986, of at least seven percent, net of marketing fees and other expenses. SLG expected the residual value to decline to near zero by June 30, 1993, the deferral date in the long-term notes. The parties stipulated that the transactions had economic substance and that SLG had a profit motive in entering into the transactions with Pluto and Knight. SLG, therefore, acquired a depreciable interest in the equipment on June 30, 1978. SLG used $ 4,962,000.45 as the *384 basis of the equipment in computing its depreciation deductions on its Federal income tax returns. SLG received $ 3,600 from Pluto and $ 2,280 from Knight on or shortly after February 28, 1980, representing the monthly cash flow from the transactions for the 18-month period from July 1978 through December 1979. SLG reported rental income, depreciation, and interest expense from the sale and leaseback transactions in 1979, 1980 and 1981 as follows: 1979
1980
1981
Rental income
$ 480,366 $ 1,044,022 $ 1,041,862 Depreciation
(827,007)
(827,007)
(827,007)
Interest expense
(640,521)
(479,255)
(418.905)
Petitioner reported and deducted its distributive share of partnership losses and investment interest expense for the years in issue on its Federal income tax returns as follows: 1979
1980
1981
Income (loss)
($ 19,074)
$ 11,926 $ 11,747 Interest expense
(8,706)
(12,525)
(11,919)
The investment interest expense petitioner deducted for the taxable years 1979, 1980 and 1981 was less than its allocable share from SLG for those years because of the section 163 limitations. In his notice of deficiency, *385 respondent disallowed all income and deductions from the SLG sale and leaseback transactions. The Bankruptcies
O.P.M. began proceedings pursuant to Chapter 11 of the Bankruptcy Reform Act of 1978 on March 11, 1981. Funding began similar proceedings on October 23, 1981. In the course of the proceedings, SLG, Pluto and Funding agreed to an Assumption, Modification and Compromise of controversies with respect to the sale and leaseback transactions. SLG, Knight and O.P.M. entered into similar agreements. The bankruptcy court approved the modifications. The agreements generally provided that SLG's cash flow of $ 200 and $ 160 per month, including amounts past due and amounts not yet due, would become unsecured general claims against Funding and O.P.M., respectively. Funding's and O.P.M.'s lease payments were reduced to eliminate the cash flow. As a result, the lease payments from Funding to SLG, the note payments from SLG to Pluto and the note payments from Pluto to Funding were of equal amounts. Similarly, the lease and note payments between O.P.M., SLG and Knight were of equal amounts. The modifications also provided that the rent and note payments were to offset each *386 other by debits and credits, and the order in which the rental and note payments were due was reversed. OPINION We must decide whether long-term promissory notes of petitioner's partnership represent valid debt. We hold that these notes were not valid indebtedness. We hold that additions to tax pursuant to sections 6651(a)(1) and 6653(a) are warranted. We also hold that none of petitioner's loss deductions from the partnership attributable to this indebtedness is allowable pursuant to section 465 and, therefore, that petitioner is liable for interest on a tax-motivated transaction pursuant to section 6621(c). Petitioner, a trust, is a limited partner in a partnership that entered into transactions for the sale and leaseback of computer equipment. In each transaction, the Leasing Corporations purchased from and leased back to end users certain computer equipment, financed by institutional lenders. Next, the Leasing Corporations sold the equipment to and leased it back from the Intermediary Corporations. Then, the Intermediary Corporations sold the equipment and assigned the leases to petitioner's partnership, SLG. SLG's purchases were financed with relatively small cash down *387 payments, and long-term promissory notes labeled "recourse." The sale and leaseback transactions between the Leasing Corporations, the end users and the Lenders were arm's-length transactions between independent parties reflecting competitive rates and terms. See Frank Lyon Co. v. United States, 435 U.S. 561 (1978). Respondent does not dispute the reality of the transactions between the Leasing Corporations and the end users. Moreover, the parties have stipulated that the transactions at issue had economic substance and that SLG had a profit motive. That a transaction has economic substance, however, "does not necessarily imply * * * that each part of the transaction is genuine." Bussing v. Commissioner, 89 T.C. 1050, 1058 (1987) (supplemental opinion). Respondent challenges the validity of the long-term notes issued by SLG in its transactions with the Intermediary Corporations. Respondent contends that these long-term notes were unenforceable and mere contingencies. Petitioner argues that the notes represent valid indebtedness because they could be enforced if the Leasing Corporations declared bankruptcy and the underlying leases were rejected *388 by a trustee in bankruptcy. A note which does not represent genuine indebtedness can neither be included in basis nor support a deduction for interest expense. Knetsch v. United States, 364 U.S. 361 (1960); Bussing v. Commissioner, 88 T.C. 449, 463 (1987), supplemental opinion 89 T.C. 1050 (1987). A valid debt is an enforceable and unconditional promise to pay money. Linder v. Commissioner, 68 T.C. 792, 796 (1977). A contingent obligation is not true debt. E.g., Estate of Baron v. Commissioner, 83 T.C. 542, 550-553 (1984), affd. 798 F.2d 65 (2d Cir. 1986). SLG had the right, pursuant to the terms of the long-term notes, to defer any payment to the extent rental payments from Funding and O.P.M. were overdue. More importantly, the long-term notes provided that any deferred amounts reduced unpaid principal and interest outstanding at the termination of a lease. SLG's obligation to make payments on the long-term notes, therefore, was specifically subject to Funding's or O.P.M.'s paying the rent due in the lease agreements. The notes also provided that if the Leasing Corporations defaulted *389 and their leases were terminated, any unpaid amounts on Pluto's or Knight's limited recourse notes would be deferred until June 30, 1993. O.P.M.'s and Funding's long-term notes to the institutional lenders were nonrecourse. The residual value of the equipment was expected to be near zero on June 30, 1993. Consequently, Pluto's and Knight's notes, as well as O.P.M.'s and Funding's notes, could be satisfied by forfeiting the near worthless equipment. In addition, the lease agreements provided that a default on the lease obligations would give rise to a right of indemnification of the lessor, SLG, against any resulting loss, cost, damage, injury or expense. Any rent not realized by SLG due to O.P.M.'s or Funding's default on the lease would appear to be a loss, cost, damage or injury subject to indemnification. An amount owed by O.P.M. or Funding for indemnification would be a "Past Due Sum" under the lease, which, if not paid, would reduce the unpaid principal and interest on the long-term notes pursuant to the setoff provisions, and SLG would not be required to pay its notes. SLG, therefore, was not unconditionally obligated to pay the debt represented by the long-term notes. *390 We have found that genuine debt exists in a sale and leaseback transaction where the obligor was responsible for the monthly note payments regardless of whether its lessee paid the rent. Gefen v. Commissioner, 87 T.C. 1471, 1494 n.15 (1986). We have also observed that a debt may be valid if the note does not require payment solely out of rental income. Cooper v. Commissioner, 88 T.C. 84, 111 (1987). Neither circumstance exists in these transactions. Pursuant to the terms of the long-term notes, SLG had no obligation to "pay" on the notes except to the extent of Funding's or O.P.M.'s rental obligation. Prior to the bankruptcy proceedings, SLG was due $ 200 and $ 160 more than Funding's and O.P.M.'s rental payments each month. Some of this cash flow was never paid. SLG's note payments in effect were due solely out of rental receipts. Moreover, SLG was responsible for the monthly note payment only if the Leasing Corporations paid the rent. Petitioner argues that the notes represent valid indebtedness because of the potential effects from the possibility that Funding or O.P.M. would declare bankruptcy. Petitioner contends that a trustee-in-bankruptcy *391 or debtor-in-possession could reject the leases, and no rental would be "past due" because no rental would become legally "due" after rejection of the leases. Under this theory, SLG would have no right to offset the note payments with the unpaid rentals and would be subject to claims for collection on the notes. In petitioner's view, SLG would be liable on the notes and have only a claim as a general creditor against the bankrupt estate. This argument turns on three speculative possibilities: (1) that O.P.M. and Funding would declare bankruptcy, (2) that the leases would be rejected in bankruptcy, and (3) that SLG's note would be regarded as having significance independent of the lease agreement. First, we cannot accept the implausible argument that SLG entered these transactions with a view that the Leasing Corporations would declare bankruptcy. Particularly in light of the stipulation that SLG had a profit motive, we do not believe that SLG anticipated the bankruptcy of the Leasing Corporations (which would eliminate its cash flow and reduce its potential for realizing any residual value). Second, the evidence does not suggest that bankruptcy was a realistic or anticipated event *392 in 1978, 1979 or 1980. We, therefore, disregard it for those years. Third, even considering the possibility of bankruptcy and its potential effects on the various network of agreements and legal obligations, particularly on the leases and on the long-term indebtedness, we do not believe that the stated indebtedness was real. The Leasing Corporations did in fact declare bankruptcy in 1981. The actual consequences of the bankruptcies, however, support our holding that the long-term notes did not represent genuine indebtedness. The trustee-in-bankruptcy and debtor-in-possession for the respective Leasing Corporations did not reject the leases and attempt to collect on SLG's notes. Instead, SLG, the Intermediary Corporations and the Leasing Corporations agreed to modify the long-term notes. Pursuant to their agreement, SLG's cash flow was eliminated; the rent payments were modified to equal the note payments. The modifications reversed the priority of payments so that note payments were to be credited prior to the Leasing Corporations' rental payments, but SLG retained the offset and deferral rights contained in the original notes. Even for 1981, therefore, the year the Leasing *393 Corporations actually had declared bankruptcy, SLG did not have an unconditional obligation to pay the amounts of the long-term notes. The closed circularity of the offsetting rent and debt obligations persisted; the change was in form only -- to invert the subtrahend and the minuend, i.e., the rent was to be subtracted from the debt; previously, the debt had been subtracted from the rent. Moreover, had the leases been disaffirmed, we believe SLG had substantial legal arguments that the notes were not recourse but that the obligations on the notes were impliedly wholly dependent on realizing rentals under the lease agreement. We do not decide this issue, however, because we do not decide hypothetical cases. In addition, the recourse notes SLG executed for the prepaid interest required by the long-term notes further support our holding. These recourse notes obligate SLG for some of the same interest payments the long-term notes already required. Such redundancy is further evidence that no unconditional obligation existed pursuant to the long-term notes, and the parties knew it. The long-term notes provided for interest prepayments in the following amounts: SLG to Pluto
SLG to Knight
Due 1978
$ 70,000
$ 56,250
Due 1979
89,000
62,100
*394 Despite the existing "obligation" for these same amounts in the long-term notes, SLG also executed recourse notes in the same amounts to Pluto and Knight (these notes were identical to the recourse notes on which the Intermediary Corporations were obligated to the Leasing Corporations). These notes do not include deferral and setoff provisions. Petitioner relies on Levy v. Commissioner, 91 T.C. 838 (1988), a case factually very similar to this case. The structure of the sale and leaseback transactions in Levy is almost identical to the transactions at issue. In Levy, a leasing corporation, DPF, purchased computer equipment, financed by an institutional lender, and leased it to an end user. The leasing company then sold the equipment to another company, AARK, for relatively small cash payments, and long-term promissory notes. AARK sold the equipment to the taxpayer, also for relatively small cash payments, and long-term promissory notes. The notes provided that the taxpayer's liability on the notes would be discharged by any amount AARK owed and failed to pay DPF or the institutional lender. The taxpayer leased the equipment back to the leasing *395 company. We found that the taxpayer's notes represented valid debt obligations. 91 T.C. at 870-871. The discharge provisions in the notes in Levy, however, were very different than the setoff and discharge provisions in SLG's long-term notes. In Levy, the discharge provisions protected the investor from making the same payment twice if the intermediary or leasing corporation failed to use the payment to make its own debt payment. Also, the investor had the option of making a debt payment directly to the leasing corporation if the intermediary corporation was delinquent in its payments to the leasing corporation. 91 T.C. at 870. No other protection was provided for the investors. In these transactions, SLG's deferral rights were much broader. SLG could defer payment on the notes to the extent it did not receive rentals. When the lease ended, SLG could offset the notes with the deferred amounts. Levy, therefore, does not support petitioner's argument. Additions to Tax
Respondent determined an addition to tax pursuant to section 6651(a)(1) for 1979. Section 6651(a)(1) provides for an addition to tax for failure to file a Federal *396 income tax return on time unless the taxpayer shows that the failure to file was due to reasonable cause and not willful neglect. The addition is five percent of the correct tax for each month the return is not filed, to a maximum of 25 percent. Sec. 6651(a)(1). A taxpayer may show reasonable cause for late filing if he "exercised ordinary business care and prudence" in his attempt to file timely. Sec. 301.6651-1(c)(1), Proced. & Admin. Regs. Petitioner filed its 1979 tax return on November 5, 1981, more than eighteen months after the April 15, 1980, due date. Petitioner argues that its trustee relied on an employee to file the return and that when its trustee discovered that the employee had not filed the return, the trustee made all reasonable efforts to have the return filed as quickly as possible. In general, a taxpayer has a personal, nondelegable duty to file the return when due and reliance on an agent does not constitute reasonable cause. United States v. Boyle, 469 U.S. 241 (1985); Logan Lumber Co. v. Commissioner, 365 F.2d 846, 854 (5th Cir. 1966), affg. on this issue a Memorandum Opinion of this Court. If the taxpayer knows a *397 return is required but entrusts the responsibility of preparing the return to a third person, that person's failure is not reasonable cause for the taxpayer's failure. United States v. Boyle, supra; Latham Park Manor, Inc. v. Commissioner, 69 T.C. 199, 219 (1977), affd. without published opinion 618 F.2d 100 (4th Cir. 1980). Petitioner's trustee entrusted the responsibility for filing the 1979 return to his employee. The trustee, a tax attorney, knew when the return was due and certainly did not rely on his employee for advice. The trustee cannot avoid responsibility by blaming a clerical employee, particularly if, as the evidence suggests, the trustee did not exercise responsible oversight of the clerical employee's performance. The clerical employee's failure is, in short, the responsibility of the trustee. The employee's failure cannot excuse the delinquent filing of petitioner's return. We sustain respondent's determination of the section 6651(a)(1) addition to tax for 1979. Respondent also determined additions to tax pursuant to section 6653(a) for the taxable years 1979 and 1980. Section 6653(a), as in effect in 1979 *398 and 1980, provided for an addition to tax equal to five percent of an underpayment if any part of the underpayment was due to negligence or intentional disregard of the rules or regulations. For purposes of section 6653(a), negligence is defined as lack of due care or failure to do what a reasonable and prudent person would do under the circumstances. Neely v. Commissioner, 85 T.C. 934, 947 (1985). Respondent's determination is presumptively correct, and petitioner has the burden of proof on this issue. Rule 142(a), Tax Court Rules of Practice and Procedure. We have held that the losses petitioner claimed on its 1979 and 1980 returns related to the long-term notes are not allowable. The business and tax experience of petitioner's trustee, a tax attorney, as evidenced by his testimony and participation in the trial and briefing in this case, is extensive, and we believe that he knew that at best the long-term note represented a mere contingency and was not valid debt. For a trustee with such knowledge of the tax law, taking losses based on a note that does not represent valid indebtedness is negligent. We sustain respondent's determination on this issue. *399 We next consider whether petitioner is liable for the additional interest imposed on underpayments attributable to tax motivated transactions pursuant to section 6621(c), formerly section 6621(d). Section 6621(c) provides for an increase in interest to 120 percent of the applicable rate for underpayments exceeding $ 1,000 attributable to tax motivated transactions. The term "tax motivated transaction" includes "any loss disallowed by reason of section 465(a)." Sec. 6621(c)(3)(A)(ii). We believe that the language of section 6621(c)(3)(A)(ii) includes losses disallowed by reason of invalid debt. First, section 465(a) does not operate to disallow losses, rather it operates to allow losses. Consequently, unless a loss is allowable under section 465(a), it must be a "loss disallowed by reason of section 465(a)." Second, if debt is not valid, the putative principal amount of the "debt" cannot be "an amount borrowed." If there is no "amount borrowed," then the taxpayer cannot be at risk within the meaning of section 465(a). If the taxpayer is not "at risk" the loss is not allowable within the meaning of section 465. Petitioner's losses are disallowed because they arise out of long-term *400 notes that do not represent genuine indebtedness. As a result, the principal amounts of the long-term notes do not constitute "amounts borrowed" for which petitioner could be at risk. See secs. 465(a), 465(b)(1); Waddell v. Commissioner, 86 T.C. 848, 914 (1986), affd. 841 F.2d 264 (9th Cir. 1988). Petitioner is not at risk within the meaning of section 465(a) for amounts that are not valid debt. See Baughman v. Commissioner, T.C. Memo. 1989-59, on appeal (5th Cir., May 1, 1989). The underpayment attributable to the long-term notes exceeded $ 1,000. Consequently, we sustain respondent's increase to interest pursuant to section 6621(c). Decision will be entered under Rule 155. Footnotes
1. All section references are to the Internal Revenue Code of 1954 as in effect for the years in issue, unless otherwise indicated. ↩
2. The statute of limitations on assessment for the year 1978 is open solely pursuant to section 6501(j).↩